(January 11, 1910.)

## C. P. LATTIG, Respondent, v. JOHN E. SCOTT, Appellant, and ROBERT GREEN, Respondent.

[107 Pac. 47.]

RIPARIAN RIGHTS—COMMON-LAW RULE OF TITLE—UNSURVEYED ISLANDS
—PLAT OF SURVEY PRIMA FACIE EVIDENCE—GOVERNMENT BOUND BY
SURVEY AND PLAT—TITLE TO UNSURVEYED ISLANDS.

1. The common-law rule of riparian ownership has been adopted
in Idaho, and under and by that rule a riparian proprietor on a
fresh-water stream, whether navigable or non-navigable, takes title
to the thread of the stream.

2. As a general rule, the omission on the part of the government
to take notice of an existing island or tract of land between the
meander line along a stream of fresh water and the stream itself
which it purports to meander, and the subsequent approval of a
survey thereof and the plats of such survey, is to be taken as evi-
dence that the island or strip of land beyond such meander line
was intended to pass as a part of and incident to the surveyed abut-
ting upland.

3. Ordinarily the government is bound by its own plats, and a
patent issued referring to the official plats amounts to an adoption
of such plats as a part of the description, and the natural monu-
ments therein designated and shown are ordinarily controlling as
to the true boundary line. The plat and field-notes made from a
survey of public lands which has been approved and adopted by
the government showing fractional subdivisions along a meandered
stream of fresh water, showing all the dry land as having been
surveyed and the balance of the legal subdivisions as covered by
the waters of the stream, constitute *prima facie* evidence that no
island of which the government ·takes notice existed opposite such
fractional subdivisions at the time the survey was made.

4. Where P. and G. purchased fractional subdivisions of the pub-
·lic domain meandering the Snake river and took title by patents
issued in 1894 and 1895, respectively, for such tracts of land, and
the description contained in such conveyances referred to an official
survey made in 1868 and the plat thereof on file in the land office,
*held,* that the patentees took title to the respective portions of an
island extending along the course of the stream and between the
meander line and the thread of the stream.

(Syllabus by the court.)

APPEAL from the District Court of the Seventh Judicial
District of the State of Idaho, for Canyon County. Hon.
Ed L. Bryan, Judge.

Action in ejectment. Judgment in favor of the plaintiff and the defendant Green, and against the defendant Scott. Defendant Scott appealed from the judgment and an order denying a motion for a new trial. Judgment *affirmed*.

Richards & Haga, for Appellant.

Whenever the question in any court, state or federal, is whether the title to land which has once been the property of the United States has passed from the federal government, that question must be resolved by the laws of the United States. (*Wilcox v. Jackson*, 13 Pet. 517; 10 L. ed. 273; *Irvine v. Marshall*, 20 How. 558, 15 L. ed. 994; *Gibson v. Chouteau*, 13 Wall. 92, 20 L. ed. 534.)

The courts of the United States will construe the grants of the general government without reference to the rules of construction adopted by the states for their grants, but whatever incidents or rights to the soil *under navigable waters* attach to the ownership of land conveyed by the government will be determined by the states, subject to the condition that their rules do not impair the efficacy of the grants or the use and enjoyment of the property by the grantee. (*Shively v. Bowlby*, 152 U. S. 1, 14 Sup. Ct. 548, 38 L. ed. 331, 347; *St. Anthony etc. Co. v. St. Paul*, 168 U. S. 349-362, 18 Sup. Ct. 157, 42 L. ed. 497, 502; *Packer v. Bird*, 137 U. S. 661, 11 Sup. Ct. 210, 34 L. ed. 819.)

Islands in existence at the time of the survey of the mainland and prior to the admission of the state into the Union are subject to survey and grant by the government as other public lands, and do not pass to the grantees of the mainland opposite the island or to the state. (*United States v. Mission Rock Co.*, 189 U. S. 391, 23 Sup. Ct. 606, 47 L. ed. 865; *Mission Rock Co. v. United States*, 109 Fed. 763, 48 C. C. A. 641; 1 Farnham on Waters, p. 50; *Granger v. Swart*, 1 Woolw. 88, Fed. Cas. No. 5685; *Packer v. Bird*, 71 Cal. 134, 11 Pac. 873, 137 U. S. 661, 11 Sup. Ct. 210, 34 L. ed. 819; *Horne v. Smith*, 159 U. S. 40, 15 Sup. Ct. 988, 40 L. ed. 68.)

The government is not required to survey an island in navigable waters at the time the mainland is surveyed. And

the failure of the surveyor to show such island on the official plats does not operate to pass title from the government to the riparian owner, or estop it from making claim thereto when its attention is directed to it. (*Kirwan v. Murphy*, 189 U. S. 35, 23 Sup. Ct. 599, 47 L. ed. 698; *Niles v. Cedar Point Club*, 175 U. S. 300, 20 Sup. Ct. 124, 44 L. ed. 171; *Moffat v. United States*, 112 U. S. 24, 5 Sup. Ct. 10, 28 L. ed. 623; *Whitside v. United States*, 93 U. S. 247, 23 L. ed. 882.)

The executive department has not the power to strip the government of its public lands by a mere method of survey, and the running of a meander line does not affect the title of the United States to the land beyond the meander, and one receiving a patent for the full acreage paid for will not be heard to insist that by reason of an error on the part of the surveyor he is entitled to more land than he paid for. (*Niles v. Cedar Point Club, supra; Barnhart v. Ehrhart*, 33 Or. 274, 54 Pac. 195; *Horne v. Smith*, 159 U. S. 40, 15 Sup. Ct. 988, 40 L. ed. 68; *Security Land etc. Co. v. Burns*, 193 U. S. 167, 24 Sup. Ct. 425, 48 L. ed. 662; *Security Land etc. Co. v. Burns*, 87 Minn. 97, 94 Am. St. 684, 91 N. W. 304, 63 L. R. A. 157; *French Glenn Livestock Co. v. Springer*, 35 Or. 312; 58 Pac. 102; *French Glenn Livestock Co. v. Springer*, 185 U. S. 47, 22 Sup. Ct. 563, 46 L. ed. 800; *Carr v. Moore*, 119 Iowa, 152, 97 Am. St. 292, 93 N. W. 52; *Grant v. Hemphill*, 92 Iowa, 218, 59 N. W. 263, 60 N. W. 618; *Lammers v. Nissen*, 4 Neb. 245; *Bissell v. Fletcher*, 19 Neb. 725, 28 N. W. 303; *James v. Howell*, 41 Ohio St. 696.)

The statutes of the United States relating to the disposal of the public domain confer no power to sell unsurveyed public land; neither do they invest the courts with authority to enlarge the grants actually specified in the patents of the United States. (*Barnard v. Ashley*, 18 How. 43, 15 L. ed. 285; *Grogan v. Knight*, 27 Cal. 519; *United States v. Curtner*, 38 Fed. 1; *Shiveley v. Bowlby, supra; Chas. River Bridge v. Warren Bridge*, 11 Pet. 420, 544-548, 9 L. ed. 773, 822-824; *Central Trans. Co. v. Pullman's Palace Car Co.*, 139 U. S. 24, 11 Sup. Ct. 478, 35 L. ed. 55.)

An island in existence at the time of the admission of the state into the Union, consisting of 138 acres of dry land and

adapted to the ordinary agricultural uses, and not subject to overflow, is not part of the *river bed,* and title thereto does not pass by implication or legal intendment to either the state or the riparian owner, but may be claimed, surveyed and sold by the government as other public lands. (*Mission Rock Co. v. United States,* 109 Fed. 763, 48 C. C. A. 641; S. C., 189 U. S. 391, 23 Sup. Ct. 606, 47 L. ed. 865, and cases cited *supra.*)

A grantee of the government of fractional lots containing within the meander lines the entire acreage for which the government received pay does not take title under his patent to an unsurveyed island (subsequently claimed and surveyed by the government) under the facts of this case. In such cases the riparian owner will take only to the meander thread of the nearest channel of the river. (*Steinbuchel v. Lane,* 59 Kan. 7, 51 Pac. 886; *Shoemaker v. Hatch,* 13 Nev. 261.)

Where the land department, when its attention is called to an unsurveyed island containing 138 acres of upland situated in a navigable river and surrounded by large and permanent channels of running water during all seasons of the year, causes it to be surveyed and sold as other public lands, its decision that the island is part of the public domain will be sustained by the courts. (*United States v. Moore,* 95 U. S. 760, 24 L. ed. 588; *Whitaker v. McBride,* 197 U. S. 510, 25 Sup. Ct. 530, 49 L. ed. 857; *White v. Whitcomb,* 13 Ida. 490, 512-514, 90 Pac. 1080; *Heath v. Wallace,* 133 U. S. 582, 11 Sup. Ct. 380, 34 L. ed. 1068; 32 Cyc. 1020 et seq.)'

Ira W. Kenward, and Karl Paine, for Respondents.

The riparian owner takes title to the thread of the stream, both in navigable and non-navigable rivers, subject to an easement for the use of the public. (*Johnson v. Hurst,* 10 Ida. 308, 77 Pac. 784; *Shields v. Johnson,* 10 Ida. 481, 79 Pac. 391; *Moss v. Ramey,* 14 Ida. 598, 95 Pac. 513; *Johnson v. Johnson,* 14 Ida. 561, 95 Pac. 499; *Shaw v. Oswego Iron Co.,* 10 Or. 379, 45 Am. Rep. 146; 15 New International Ency. 49.),

### STATEMENT OF CASE.

This action was instituted by plaintiff to quiet his title to a tract of land commonly known by the designation of "Poole Island" in the Snake river. The plaintiff claimed a part of the island by reason of owning the upland which meandered the river, and claimed the balance of the island against the owner of the upland by reason of adverse possession. The defendant, Scott, who is appellant in this case, claimed that while the island was public unappropriated lands he entered upon the same, and that the title to the land is in the United States government, and that the plaintiff has no title or right of possession in or to the property.

The facts of the case are as follows: This land was surveyed under the order and direction of the commissioner of the general land office of the government in September, 1868. The field-notes to sections 10, 15, and 22 of township 9 north, range 5 west, among other things show as follows: In the survey of the north boundary to sec. 22, the surveyor says: "Set a post with charred stake in mound of earth, with pits as per instructions for cor. to frac. secs. 15 and 22 on the right bank of Snake river." With reference to lines between secs. 10 and 15 the notes say: "Set post with charred stake in mound of earth with pits as per instructions for cor. to frac. secs. 10 and 15 on the right bank of Snake river." Again, with reference to the east boundary of sec. 10, he says: "Set post with charred stake in mound of earth with pits as per instructions for cor. to frac. secs. 10 and 11, on right bank of Snake river." With reference to line between sections 21 and 22, he says: "Set post with charred stake in mound of earth with pits as per instructions for cor. to frac. secs. 21 and 22 on right bank of Snake river." This is followed by the notes of the meanders of the *right bank of Snake river* for sections 10, 15, and 22. Among other things to be found in the "general description" to the township, it is said: "This township contains a fair proportion of rich bottom land situated on the *Snake and Payette rivers.*" The following map is a copy of that portion of the plats returned

an1 filed by the surveyor covering and including the land in question in this case, which is located in sections 15 and 22:

# T 9 N. 5 W.

*(Surveyed by A.M.Thompson, in Sept., 1868)*

Some years prior to May 29, 1894, Samuel W. Poole made application under the act of Congress of April 24, 1820, for the purchase of lots numbered 2, 3, and 4 in section 15, town. 9 N., range 5 W., and paid for 73.30 acres of land, and thereafter on the 29th day of May, 1894, the patent of the United States duly and regularly issued to Poole for the above-described tracts. About one-half of the island in length lay opposite and directly west of these three fractional lots of land. Poole had been residing on the island since prior to 1883, and he and his successors, assigns, and grantees have ever since been in the possession and occupancy of the land, claiming the same. The plaintiff Lattig is the successor in interest by mesne conveyance from Poole, the original patentee. Some years prior to 1895, the respondent, Robert Green, entered and filed upon lots numbered 1 and 2, and the SE. ¼ of the NE. ¼ of Sec. 22, town. 9, under the Homestead Act of May 20, 1862; and in pursuance thereof and on the 4th day of February, 1895, a patent of the United States issued to Robert Green for the lands last above described. In each of these patents it was recited as a part of the description of the land that it was "according to the official plat of the survey of the said land returned to the general land office by the surveyor general." The defendant Green appears to have likewise taken possession of that portion of the island which lay directly west of and opposite to the fractional subdivisions patented to him, and to have continuously used and occupied and claimed the same up to the time of the commencement of this action.

Some years prior to the commencement of this action the appellant, John E. Scott, entered upon this island as the employee of one of the owners of the upland, but thereafter asserted his rights as a settler on public domain and took steps with a view to connecting his claim with the title of the United States to such lands. He made application to the general land office to have the island surveyed as a part of the public domain, and thereafter and in the month of March, 1906, the commissioner of the general land office ordered a survey of the island. Such proceedings were accordingly

had that thereafter and about the month of June, 1906, a survey was made and the surveyor returned his field-notes together with a plat showing the land surveyed. The portion of this plat covering the island and the lands in question is as follows:

The case went to trial before the court without a jury, and the court made findings of fact as follows:

"This cause came on regularly for trial on the 9th day of July, 1907, before the court without a jury, a jury trial having been duly waived by the parties, at chambers, in the

city of Payette, Idaho, by stipulation of counsel, I. W. Kenward, Esq., appearing as attorney for plaintiff, Richards & Haga, Esqs., for defendant J. E. Scott, and Karl Paine, Esq., for the defendant Robert Green, the defendants Bert Jakoaks, George T. Thebo, John Talbot, Charles Cravin, and S. L. Sparks not appearing by counsel or otherwise, and the court having heard all the evidence and proofs produced herein and duly considered the same, and being fully advised in the premises, and it appearing therefrom to the satisfaction of the court that the defendants, Bert Jakoaks, George T. Thebo, John Talbot, Charles Cravin and S. L. Sparks, were duly and regularly summoned to answer unto the plaintiff's complaint herein, and that each has made default in that behalf, and that the default of each for not appearing and answering unto plaintiff's complaint was duly and regularly entered herein, from the evidence introduced at the trial the court finds the facts as follows, to wit:

"1. That on the 2d day of July, 1904, the plaintiff was and ever since has been, and his grantors were for many years prior thereto, the owners of and entitled to the possession of lots 1, 2, 3 and 4 of section 15, township 9 north, range 5 west, Boise meridian, situated in Canyon county, state of Idaho, and all of that portion of the island known as Poole island which lies west of and opposite the meander line of said lots and between said meander line and the middle of the main channel of Snake river.

"2. That the defendant Robert Green now is, and for more than thirteen years last past has been, the owner of, in the possession of, and entitled to the possession of all of the fractional north half of section 22 in township 9 north, range 5 west, Boise meridian, in Canyon county, Idaho, and of that portion of the island known as Poole island which lies west of and opposite the meander line of said fractional north half, and between said meander line and the middle of the main channel of Snake river.

"3. That at the time of the commencement of this action, and for ten years and more prior thereto, the defendant S. L. Sparks was the owner, in the possession of, and entitled

to the possession of the fractional south half of section 22, township 9 north, range 5 west, Boise meridian, in Canyon county, Idaho, excepting, however, that portion thereof which lies west and opposite the meander line of said fractional south half and east of the middle of the main channel of Snake river, known as part of Poole island, and as to that part of Poole island the court finds: That for the last twenty years immediately preceding the beginning of this action and continuously during said twenty years, the plaintiff and his grantors have claimed title to, have claimed and occupied, have been in possession of and controlled and managed, cultivated and improved the same land, and during all of said twenty years continuously the plaintiff and his grantors have paid all the taxes, state, county, municipal or school, which have been levied and assessed upon the above-described lands, according to law; and that no taxes have been levied thereon during said time, and that plaintiff is the owner thereof.

"4. That at the point opposite the land and the whole thereof before described, Snake river is a navigable stream and the main channel thereof is west of said Poole island, and the center of said main channel forms the boundary line between the states of Oregon and Idaho, and said island lies east of the center of said main channel and within the state of Idaho.

"5. That on the 16th, 18th and 19th days of June, 1906, upon application of defendant J. E. Scott, the government of the United States, through its land department and at the request of the commissioner of the general land office, caused the said Poole island to be surveyed at its own expense, which survey was proved and certified to by the surveyor general of the United States for the state of Idaho, on the 18th day of October, 1906, and accepted by the commissioner of the general land office on or about the 15th day of December, 1906, and the plat of such survey sent to the United States land office at Boise, Idaho, by said commissioner, to be filed in such office after notice as is required by law and the rules of the land department for the filing of plats and authorizing the entry of public lands. And the register and

receiver of the United States land office for Boise, Idaho, on the 20th day of May, 1907, did issue, post and publish the notice required by law and the rules of such department, wherein it was stated that the said plat of the survey of said island would be filed in said land office at Boise, Idaho, at 9 o'clock A. M. on the 8th day of July, 1907; that no protest or objection of any kind was made by the plaintiff or the defendant Robert Green against the making of said survey or against the application of this defendant for a survey of said island, and that due notice of defendant Scott's application for a survey of the said island was duly and regularly served on the defendant Robert Green, but the same was not served upon the plaintiff; that the defendant Robert Green was by said notice advised, notified and requested to file with the United States surveyor general for the state of Idaho, within thirty days from service thereof, his objections, if any he had, to the survey of said island, or to the application of defendant Scott for a survey thereof, but defendant Green wholly ignored the said notice, but informed the defendant Scott that he was the owner of that part of Poole island which lies west and opposite to his said land; that the said land embraced in said island and as shown by the plat and the survey made of said island and now on file in the office of the United States surveyor general in the general land office of the United States, consists of lots numbered 5, 6 and 7 of section 15, and lots numbered 5 and 6 of section 22, township 9 north, range 5 west, Boise meridian, and contains 138.15 acres; that the said land embraced in said island is not now and has not been part of the public domain of the United States since the government parted with its title to the said lands of plaintiff, defendant Scott and defendant Sparks by its patents duly issued more than thirteen years ago; that the defendant Scott has occupied and claimed said island for several years last past and prior to the commencement of this action; that he claimed and held and occupied the same and cultivated a part thereof, under the provisions of chapter 4, title 10 of the Code of Civil Procedure of the Revised Statutes of Idaho of 1887, and with the intention to enter, file upon

and claim the said island as a homestead under the public land laws of the United States as soon as the same was surveyed and subject to entry; that plaintiff and defendant Green were the owners and in the possession of said island at the time that defendant Scott went upon said island and occupied or claimed the same.

"6. That for a long time prior to the commencement of this action the defendant Scott was and still is claiming an interest in and to said island adverse to the plaintiff and the defendant Green; that he has no right, title, estate or interest in or to said island or to any part thereof, and that plaintiff and defendant Green are entitled to a decree quieting their title to said island and enjoining the defendant Scott from setting up or asserting or claiming any right, title or interest therein."

Conclusions of law were drawn accordingly and decree was entered in favor of plaintiff Lattig, holding that he was the owner of that portion of the island lying directly west of and within the lines of the fractional subdivisions owned by him meandering the Snake river, and likewise in favor of the defendant Green, holding that he was the owner of that portion of the island lying directly west of and within the side lines and the fractional subdivisions owned by him and meandering the river. The defendant Scott has appealed from the judgment and order denying his motion for a new trial.

AILSHIE, J. (After stating the facts.)—The only question to be determined in this case is this: Did the United States convey this island to its grantees, Poole and Green, by the patents issued to them in 1894 and 1895? In answering this question there are some well-recognized rules it will be necessary to observe. It has been repeatedly held by the supreme court of the United States and is now the settled law of the land that the "grants by the United States of its public land bounded on streams and other waters, made without reservation or restriction, are to be construed as to their effect according to the law of the state in which the land lies." (*Grand Rapids & Ind. R. Co. v. Butler*, 159 U. S. 91, 15 Sup.

Ct. 991, 40 L. ed. 87; *Hardin v. Jordan,* 140 U. S. 371, 11 Sup. Ct. 808, 838, 35 L. ed. 428; *Middleton v. Pritchard,* 4 Ill. 510, 38 Am. Dec. 112.) This rule was adopted and quoted with approval in *Whitaker v. McBride,* 197 U. S. 510, 25 Sup. Ct. 530, 49 L. ed. 857, to the same effect. As said by the court in *St. Louis v. Rutz,* 138 U. S. 226, 11 Sup. Ct. 337, 34 L. ed. 941: "The question as to whether the fee . . . . extends to the middle thread of the stream or only to the water's edge is a question in regard to a rule of property which is governed by the local law. . . . ." (*Kaukauna Water Power Co. v. Green Bay & Miss. Canal Co.,* 142 U. S. 254, 12 Sup. Ct. 173, 35 L. ed. 1010.)

In view of this well-established rule of law, we must construe these grants from the government, and their effect with reference to the boundary line along this stream, in the light of the decisions and rule of law in this state. After a very careful and full consideration of the question as to the rights of a riparian proprietor in this state, this court held in *Johnson v. Johnson,* 14 Ida. 561, 95 Pac. 499, as follows: "A riparian owner upon the streams of this state, both navigable and non-navigable, takes to the thread of the stream, subject, however, to an easement for the use of the public." There are no tide waters in this state; all our waters are fresh waters, unaffected by the ebb and flow of the tide. We therefore have no navigable streams in Idaho as viewed by the rule of the common law. We have consequently adopted the common-law doctrine that has been uniformly applied everywhere the common law prevails on the subject; that is, whether a fresh-water stream be navigable or non-navigable in fact, the riparian proprietor takes title *ad filium aquae.*

It is also equally well settled that a meander line, run in conformity to the United States statute in surveying public lands bordering on a navigable stream, is not a line of boundary, but is intended only to designate and point out the sinuosity of the bank of the stream and as a means of ascertaining the quantity of land in the fractional subdivisions to be paid for by the purchaser, and that the real and true monument in such case is the watercourse and not the meander line.

(*Johnson v. Hurst,* 10 Ida. 308, 77 Pac. 784; *Johnson v. Johnson,* 14 Ida. 561, 95 Pac. 499; *Horne v. Smith,* 159 U. S. 40, 15 Sup. Ct. 988, 40 L. ed. 68; *St. Paul & P. R. Co. v. Schur-meier,* 74 U. S. 272, 19 L. ed. 74; *Hardin v. Jordan,* 140 U. S. 371, 11 Sup. Ct. 808, 838, 35 L. ed. 428; *Jefferis v. East Omaha Land Co.,* 134 U. S. 178, 10 Sup. Ct. 518, 33 L. ed. 872.) Under the decisions of this court in *Johnson v. Hurst,* and *Johnson v. Johnson, supra,* and numerous decisions from the supreme court of the United States, as well as the courts of the various states, there could be no doubt, we think, but that it would be our duty to hold that the land comprising this island belongs to the abutting upland owners if in fact no body of water intervened between the meander line and this tract of land. As said by the supreme court in *Whitaker v. McBride,* a case in which the court awarded an island of twenty-two acres to the riparian proprietor, "If there were no islands in this case, it would not under these authorities be questioned that the title of the riparian owners extended to the center of the channel. How far does the fact that there is this unsurveyed island in the river abridge the scope of the rule?"

It should be observed at this juncture that Poole island is 8,600 feet long, extending in a northerly direction along the course of the river. Its average width is apparently about 700 feet. Opposite the lands of respondent Lattig it is something less than 700 feet wide, while opposite the lands of respondent Green it varies from some 500 to over 1,200 feet in width. It is conceded that the *Snake river* proper flows along the west side of this island, and that the navigable stream, forming at this point the dividing line between Idaho and Oregon, is the stream as it flows northerly in front of these lands and along the west side of the island. Indeed, if any controversy could arise as to the real dividing line between the two states, that would be readily settled in favor of the main channel on the west side of this island under the rule announced in *Iowa v. Illinois,* 147 U. S. 1, 13 Sup. Ct. 239, 37 L. ed. 55.

The real difficulty which has been injected into this case seems to grow out of the fact that there is a slough or high-water channel flowing from the Snake river at the upper end of this island for a distance of about one mile and a half and thence returning to the main stream and separating the island from the main land. This, it is conceded, is non-navigable except in times of high water. There is some difference among the witnesses as to the volume of water flowing in this slough or high-water channel during the ordinary and low-water season, but we think it is reasonably well established that it is very shallow at the upper end of the island, and at the intake to the slough or channel and in the upper portion thereof it does not exceed a foot in depth. Lower down the channel there seem to be some deeper places.

Plaintiff's exhibit "D" is a very comprehensive and instructive map and plat of these fractional lots, Poole Island, and the entire river opposite the same, and was made from a survey had on December 5, 1905, and some six months prior to the government taking notice of and ordering a survey of the island. This survey was made by Mr. D. A. Utter, the present surveyor general of this state, and prior to his appointment to the office he now holds. It shows the main channel of the river on the west side of the island of an average width of 1,000 feet. He designates the channel on the east side as a "slough." This seems to vary in width from 240 feet near the lower end to 385 feet at the upper end. It also shows the meander line on the right bank of the slough, as established by the 1868 survey, running very close, in most places, to the water line. The river has a fall of six feet from the upper end to the lower end of the island. This map shows a slough cutting into the island from the west side. We recite these additional facts in passing in order to give as fully as possible the situation and condition upon which we rest this opinion.

We are at once confronted with two lines of authorities from the supreme court of the United States. On the one hand are *Horne v. Smith,* 159 U. S. 40, 15 Sup. Ct. 988, 40 L. ed. 68; *Niles v. Cedar Point Club,* 175 U. S. 300, 20 Sup.

Ct. 124, 44 L. ed. 171; *French-Glenn Livestock Co. v. Springer,* 185 U. S. 47, 22 Sup. Ct. 563, 46 L. ed. 800; *Security Land & E. Co. v. Burns,* 193 U. S. 167, 24 Sup. Ct. 425, 48 L. ed. 662; and a number of state decisions to the same effect. We can most accurately state the holding of the first three of those cases by quoting from a summary made by Mr. Justice Brewer in *Whitaker v. McBride,* 197 U. S. 510, 25 Sup. Ct. 530, 49 L. ed. 857. In referring to the foregoing case he said:

"In the first of those cases it appeared that the survey stopped at a bayou, and did not extend to the main channel of the Indian river, a mile distant; and we held that the line of that bayou must be considered as the boundary of the grant; that it could not be extended over the unsurveyed land between the bayou and the main channel of the Indian river; that it was a case of an omission from the survey of land that ought to have been surveyed, and that such omission did not operate to transfer unsurveyed land to the patentee of the surveyed land bordering on the bayou. In the second, we held that, as the survey showed a meander line bordering on a tract of swamp or marsh lands, the grant by patent terminated at the meander line, and did not carry the swamp lands lying between it and the shores of Lake Erie. In the third, it appeared that there was no body of water in front of the meandered line, and we held that that line must, therefore, be the limit of the grant, and the fact that outside the side lines extended there was a body of water did not operate to extend the grant into any portion of that body of water."

The other cases are similar in facts and principle to those just reviewed.

On the other hand, there is a line of more numerous decisions from the same court holding that when the government has surveyed its lands along the bank of a river and has sold and conveyed the uplands by government patent and by legal subdivisions, the patent conveys the title to all the land lying between such meander line and the high-water mark or low-water mark or thread of the stream, as the rule may prevail in the state where the lands are situated, and that if

in a state where the riparian proprietor takes to the thread of the stream, he takes all such islands as lie on his side of the middle of the stream. (*Grand Rapids etc. R. R. Co. v. Butler,* 159 U. S. 88, 15 Sup. Ct. 991, 40 L. ed. 85; *Hardin v. Jordan,* 140 U. S. 371, 11 Sup. Ct. 808, 838, 35 L. ed. 428; *Mitchell v. Smale,* 140 U. S. 406, 11 Sup. Ct. 819, 840, 35 L. ed. 442; *Whitaker v. McBride,* 197 U. S. 510, 25 Sup. Ct. 530, 49 L. ed. 857.)

The question, therefore, confronting us is to discover, if possible, the distinguishing feature or circumstance between these two lines of authority, and ascertain the class to which the present case belongs.

In *Security Land & E. Co. v. Burns,* 193 U. S. 167, 24 Sup. Ct. 425, 48 L. ed. 662, the court followed the first line of authorities above mentioned and rested its decision specifically on the authority of *French-Glenn Livestock Co. v. Springer, supra.* That was a case where the lands claimed lay between the meander line of the patentee's lands and a lake, and the unsurveyed body of land was about 1,000 acres. The court, in passing on the case and determining the class to which it should properly belong and the rule by which it should be decided, felt called upon to give some of the reasons, facts and circumstances that influenced the court to refuse the patentee of the fractional lots the right to project his lines to the lake. We quote from the opinion some of the reasons that the court sets forth as decisive points on which the opinion turns. The court says:

"There was, in truth, no such survey as was called for by the contract between the government and the surveyor. The exterior lines, with the exception of the south line of the township, were run, but no survey of the interior of the township was ever made and no section lines thereof were ever run, with one possible exception, and in truth the survey as a whole was a fraud. No such body of water at the place indicated on the plat of survey then existed or now exists. On the contrary, the lake is from half a mile to a mile away from what is called its meander line on the plat of the survey filed by the surveyor. . . . . The surveyor never was on

the ground and never saw the lake he pretended to measure, and the lake never existed where he laid it down in his fraudulent survey. If the side lines of the various lots were protracted in their course, those of lot 3 would never reach the lake, and those of lots 5 and 6 would not reach the lake within the limits of section 4, while the south line of lot 7 would touch the lake, and a few feet of frontage would then be secured, and that lot would then have 139 instead of 25.25 acres. The side lines of lots 5, 6, and 7, if protracted, would instantly cross the protracted side lines of lot 3. There are at least 1,000 acres of high tillable land between the actual water line of the lake and the meander line as returned by the field-notes and the plat of survey, and the land is covered by trees of more than a century's growth and growing down to the water's edge. In order to bound on the lake the lots would exhibit a totally different form from that which they take on the plat of survey and such boundary would violate every rule of statutory survey, by conveying lands not conforming to the system adopted by the government, and carried out ever since its adoption.''

And, again, the learned justice in the course of the same opinion reiterates the reasons for the holding in this language:

''The fraudulent character of the survey, the nonexistence of the lake within at least half a mile of the point indicated on the plat, the excessive amount of land claimed as compared with that which was described and stated in the patents and actually purchased and paid for, the difficulty in reaching the lake at all, and the necessity, in order to do it, of going outside of section 4 (with the exception as to a small part of lot 7), the section in which the description and plat placed all the land, all go to show that the lake ought not to be regarded as a natural monument within the cases, or within the principle upon which the rule is founded, and therefore the courses and distances by which the amount of land actually purchased and paid for was determined ought to prevail.''

And again says the court: ''When the plat itself is the result of a gross fraud, and indeed is entirely founded upon it,

the reason for refusing to recognize the lake as a boundary becomes apparent.''

In the French-Glenn Livestock case, Mr. Justice Shiras in the course of the opinion gave substantially the same reasons for confining the patentee to the meander line instead of allowing him to go to the waters of Malheur Lake.

*Horne v. Smith* was a bayou case, and the court limited the patentee's grant to the waters of the bayou, and in giving the reasons for doing so said:

''In the first place, the area of the lots is given, and when that area is stated to be 170 acres, it is obvious that no survey was intended of over 700 acres.. In the second place, the meander line, as shown on the plat, is, so far as these lots are concerned, wholly within the east half of sections 23 and 26, while the water line of the main body of the river is a mile or a mile and a quarter west thereof, in sections 22 and 27. Again, the distance from the east line of the section to the meander line is given, which is less than a quarter of a mile, while the distance from such east line to the main body of the river must be in the neighborhood of a mile and a half. Further, the description in the patent is of certain lots in sections 23 and 26, and, manifestly, that was not intended to include land in sections 22 and 27.

''These considerations are conclusive that the water line which was surveyed, and made the boundary of the lots, was the water line of the bayou or savannah, and there has been simply an omission to make any survey of the tract west of the bayou, and between it and the main body of the Indian river.''

Ordinarily, the government is bound by its own plats, and a patent issued referring to the official plats amounts to an adoption of such plats as a part of the description, and the natural monuments therein designated and shown are ordinarily controlling as to the boundary line.

In *Grand Rapids & Ind. R. Co. v. Butler,* 159 U. S. 88, 15 Sup. Ct. 991, 40 L. ed. 85, the court, speaking through Mr. Chief Justice Fuller and treating of the necessity for reserving any right not intended to be granted, said:

"We entirely concur in the result reached by the state court that there was no such reservation, and in its findings as follows: 'In the present case there is no act on the part of the government showing any intention to reserve this land. The only inference that can be drawn from the facts is that the government agents, its surveyors, did not consider it of sufficient value to survey. It was not surveyed until about twenty-five years after the survey of 1831, and not till nearly twenty years after the survey of 1837, when the other islands and the lands upon the west bank were surveyed, thus completing the survey in that region.' "

In further considering the questions involved in the foregoing case, the chief justice quoted with approval from the opinion of the court in *Middleton v. Pritchard*, 4 Ill. 510, 38 Am. Dec. 112, as follows:

"Where the government has not reserved any right or interest that might pass by the grant, nor done any act showing an intention of reservation, such as platting or surveying, we must construe its grant most favorably for the grantee, and that it intended all that might pass by it. What will pass, then, by a grant bounded by a stream of water? At common law, this depended upon the character of the stream or water. If it were a navigable stream or water, the riparian proprietor extended only to high-water mark. If it were a stream not navigable, the rights of the riparian owner extended to the center thread of the current. . . . . At common law, only arms of the sea and streams where the tide ebbs and flows, are deemed navigable. Streams above tide water, although navigable in fact at all times, or in freshets, were not deemed navigable in law. To these, riparian proprietors bounded on or by the river could acquire exclusive ownership of the soil, water and fishery, to the middle thread of the current; subject, however, to the public easement of navigation. And this latter, Chancellor Kent says, bears a perfect resemblance to public highways. The consequence of this doctrine is, that all grants bounded upon a river not navigable by common law, entitle the grantee to all islands lying between the main land and the center thread of the current.

And we feel bound so to construe grants by the government, according to the principles of the common law, unless the government has done some act to qualify or exclude the right. . . . . The United States have not repealed the common law as to the interpretation of their own grants, nor explained what interpretation or limitation should be given to, or imposed upon, the terms of the ordinary conveyances which they use, except in a few special instances; but these are left to the principles of law and rules adopted by each local government, where the land may lie. We have adopted the common law, and must, therefore, apply its principles to the interpretation of their grant.''

*Middleton v. Pritchard* has been so repeatedly cited and quoted from with approval by the highest court of the land that we feel justified in accepting it as sound law.

In *Jefferis v. East Omaha Land Co.,* the court in speaking of the presumptions that must arise from the descriptions and calls of the plat and of the plat itself, says:

"It is a familiar rule of law that, where a plat is referred to in a deed as containing a description of land, the courses, distances and other particulars appearing upon the plat are to be as much regarded, in ascertaining the true description of the land and the intent of the parties, as if they had been expressly enumerated in the deed. . . . . In the present case the plat was made in accordance with the statute, showing the river as the northern boundary of fractional section 21 and of lot 4 therein; and as the patent referred to the official plat of the survey, and thus made that a part of the description of lot 4, that description made the river the boundary of lot 4 on the north. . . . . These views result in the conclusion that the side lines of lot 4 are to be extended to the river, not as the river ran at the time of the survey in 1851 but as it ran at the date of the patent in 1855, and that all the land which existed at the latter date, between the side lines so extended and between the line of the lot on the south and the river on the north, was conveyed by the patent.''

In *Mitchell v. Smale,* the patentee paid for a fractional lot of four and one-half acres within the meander line, and the

supreme court held that the patent included an unsurveyed point or tongue of high land running beyond the meander line and down into the adjoining lake containing 25 acres; and that the government by *survey made subsequent to the issuance of patent* could not reconvey this twenty-five acres between the meander line and the lake. In considering this, the court said:

"We think it a great hardship, and one not to be endured, for the government officers to make new surveys and grants of the beds of such lakes after selling and granting the lands bordering thereon, or represented so to be. It is nothing more nor less than taking from the first grantee a most valuable, and often *the* most valuable, part of his grant. . . . . The patents when issued refer to this plat for identification of the lots conveyed, and are equivalent to and have the legal effect of a declaration that they extend to and are bounded by the lake or stream. Such lake or stream itself, as a natural object or monument, is virtually and truly one of the calls of the description or boundary of the premises conveyed; and all the legal consequences of such a boundary, in the matter of riparian rights and title to land under water, regularly follow."

In *St. Clair County v. Lovingston,* 90 U. S. 46, 23 L. ed. 59, Mr. Justice Swayne, speaking for the court, said: "Where a survey and patent show a river to be one of the boundaries of the tract, it is a legal deduction that there is no vacant land left for appropriation between the river and the river boundary of such tract." (*Brown v. Huger,* 62 U. S. 305, 16 L. ed. 125; *Franzini v. Layland,* 120 Wis. 72, 97 N. W. 499.)

It will be at once observed that the first line of authorities above cited consists chiefly of marsh, bayou, slough and lake cases. On the contrary, the distinctly river cases, from states holding to the common-law rule as to the vesting of title in the riparian proprietor to the thread of the stream, almost, if not entirely without exception, hold that the grantee from the government takes not only any margin of land between the meander line and the water but also such unsurveyed islands as lie on his side of the middle of the stream.

The government in ordering the survey of public lands issues certain instructions to its surveyors. After the survey is made and the plat and field-notes are returned to the land office, an inspector appointed by the government is sent to examine the survey in detail and report thereon to the government. This is done for the purpose of checking up the work of the surveyor and verifying the same, and ascertaining if he has complied with the law and the terms of his contract. After the report of such inspector goes in the government either approves or rejects the survey and the notes and plats thereof. After these things have been done it is quite generally held, as can be seen from the foregoing authorities, that the omission on the part of the government to take notice of an existing island or tract of land between a meander line and the stream it purports to meander, and the subsequent approval of the survey, is to be taken as evidence that the island or strip of land beyond the meander line was intended to pass as a part of and incident to the upland it abuts. It has even been intimated in some of the decisions and positively asserted in others that ''Such evidence is conclusive in the absence of a judicial determination in favor of the government relieving it from mistake upon the same grounds that a private party might be relieved under the same or similar circumstances.'' (*Franzini v. Layland,* 120 Wis. 72, 97 N. W. 503; *Murphy v. Kirwan,* 103 Fed. 104; *Moore v. Robbins,* 96 U. S. 530, 24 L. ed. 848.)

Now, as we gather from the rulings and comments of the court running throughout the different cases on both sides of this question, we arrive at the conclusion that the court will only permit the government to intervene and survey land lying between the meander line and the river, or other body of water, in cases where the survey has been made prior to the sale or disposal of the fractional subdivisions or abutting land by the government, or in cases where the body of land is so large and so situated that no other reasonable inference can be drawn than that it was not the purpose and intention of the surveyor to survey the entire tract or of the government to part with title to the entire tract, and that the phy-

sical conditions and surrounding facts are so clear and patent that the purchaser could not help but know that he was not purchasing so large a body of land when buying a small fractional subdivision adjoining the unsurveyed tract. This seems to be also true in cases of palpable fraud on the part of the surveyor. It is only where the physical facts and circumstances rebut the legal presumption that the government intended to part with title to the land in question, that the court will recognize a further conveyance. In the light of these conclusions and of the foregoing authorities, we may well recount some of the undisputed facts of this case and natural inferences deducible therefrom.

In the first place, there is no pretense made that the survey of 1868 was fraudulent, nor is it contended or intimated that the surveyor who made that survey violated his instructions in any respect or acted wrongfully or fraudulently. In the absence of a showing to the contrary, "it will be presumed," says the supreme court of Minnesota, "that the surveyor did his duty, and meandered the shore line as it then existed." (*Sherwin v. Bitzer*, 97 Minn. 254, 106 N. W. 1046.) Neither is there any showing that the island in fact existed at the time the survey of 1868 was made. Under the rules of evidence recognized by this and all other courts so far as we are advised, it must be accepted as an established fact in this case that Poole island did not exist at the time of the survey of 1868. The plat and field-notes show all the land to have been surveyed and that all the intervening surface was covered by the waters of Snake river. This plat and the field-notes were made by the direction of the government, the owner of the land, and were approved by the government and constitute *prima facie* evidence of the matters and facts therein designated and recited. That being true, a *prima facie* case has been made to the effect that no island existed at the time of the survey in 1868. It may in fact have been there, and yet not have been at that time the size that the government required surveyed; or it may have been nothing more than a strip of sand or gravel-bar extending along the course of the river and considered of no importance or value.

It might have easily formed in a few years, as it is only slightly more than a mile below the mouth of the Payette river which empties into the Snake on the Idaho side. What was said by Mr. Justice Brewer in *Whitaker v. McBride* in speaking of some islands in the Platte river is very applicable in this case. He said: "Possibly they may have been regarded as having no stability as tracts of land, but as like sand-bars which are frequently found in western waters and are of temporary duration, existing to-day and gone to-morrow. Be that as it may, there is nothing to indicate any fraud or mistake on the part of the surveyor." It is contended, however, by the appellant that this island did exist at the time of the admission of the state into the Union, and that the test should be applied as of that date.

It does not seem to us that such inquiry becomes an important question here. Under the rule of law prevailing in this state, the state does not take title to the bed of the stream and it does not claim title to this island. *United States v. Mission Rock Co.*, 189 U. S. 391, 23 Sup. Ct. 606, 47 L. ed. 865, cited by appellant, was a tide land case between the government and the grantee of the state and involved the application of a different principle from that arising in the case at bar. The government never pretended to assert any claim to the island in question for sixteen years after the admission of the state into the Union, and then only upon the application of one who had squatted on the land. In fact, it had patented these fractional subdivisions to Poole and Green eleven and twelve years; respectively, prior to ever asserting any right to the island or ordering a survey thereof. The patentees and their grantees had been in the actual, open and notorious possession of this island for at least twice the period necessary to constitute the bar of the statute of limitations under the laws of this state, and, while we recognize that the statute of limitations cannot be invoked against the government, yet it is a circumstance to be considered when we remember that the government had parted with its title to the upland and had let the grantees into the possession of the premises, and had acquiesced for so long a period of time

in the patentee's possession and claim of ownership and had permitted him to improve and cultivate the same, under the assumption that he had acquired title thereto through his patent to the uplands. Poole resided on this island as early as 1883 and was living there, it seems, when he made proof on and secured title to lots 2, 3, and 4 adjacent to the island on the east.

Another thing that is worthy of note is the fact that the whole of the island, with the possible exception of a couple of acres at the upper or southern end of the island, is included within the sections (15 and 22) in which the fractional subdivisions are located that were patented to Green and to Lattig's predecessor in interest. The plats returned to the land office showed all this land as having been surveyed and that the unsurveyed portion was a part of the river. It is also significant that in the order of the department directing a survey of ''Poole island,'' they say that it is located in ''Snake river, situated in sections 15 and 22, T. 9 N., R. 5 W. Idaho.'' The department was, therefore, ordering the survey of the identical sections that had already been surveyed and returned to the general land office, and the government had parted with all of its title to those identical sections. This is, therefore, not a case where the owners of the uplands are bound by the action of the Department of the Interior. If that action had been taken prior to the issuance of their patents, then it must be conceded, we think, that they would have been bound; but at the time the government asserted its claim to this island by ordering it surveyed in 1906, and the survey was made on the application of a mere squatter, it had nothing to survey. It had conveyed all of its interest in this land to Poole and Green, and its action was without and beyond its jurisdiction and could in no way bind or affect the owners of these lands. (*Hardin v. Jordan, supra; Davis v. Weibbold,* 139 U. S. 507, 11 Sup. Ct. 628, 35 L. ed. 238; *Moore v. Robbins,* 96 U. S. 530, 24 L. ed. 848; *Noble v. Union River L. R. Co.,* 147 U. S. 174, 37 L. ed. 123.) There is nothing in connection with the facts and circumstances of the size of Poole island that would either suggest or indicate fraud

on the part of the surveyor, or would negative the *prima facie*
presumption that the government intended that the island
should go to the purchasers of the adjoining upland. Poole
paid for 73.3 acres, and the portion of this island lying be-
tween the meander of the fractional subdivisions purchased
and the thread of the stream is 54.75 acres, according to the
survey of 1906. Green paid for 98.75 acres, and the portion of
the island to which he would be entitled amounts to 83.40 acres
according to the 1906 survey. It will thus be seen that in
each case the land within the meander lines and actually paid
for is in excess of the amount to which each would be entitled
by reason of his riparian rights.

We have confined ourselves in this case almost exclusively
to a consideration of decisions from the supreme court of the
United States to the exclusion of cases from the state courts,
for the reason that this case involves a federal question. As
we read and understand the decisions from that court, we
are convinced of the correctness of our conclusion in this case.
This is not the first time a similar question has arisen in this
state. The facts of the case of *Johnson v. Johnson* involved
a somewhat similar question, as did also the case of *Johnson
v. Hurst*. In view of the fact that Snake river flows through
Idaho and constitutes the boundary line between the state of
Idaho and the states of Oregon and Washington on the west
for a sweep of some 600 miles, and that within that distance
there is a large number of islands of varying sizes on the
Idaho side of the thread of the stream, this question must
necessarily recur from time to time, and it is essential that
the rule of law be established with reference to the title to
those islands. The lands abutting on this stream have been
acquired by pioneer settlers and homesteaders in good faith
and they have, as a general rule, taken possession of and
occupied these islands and gravel and sand bars, and put them
to such use as they could make of them, and if at this late
date the government is from time to time to order those islands
surveyed and issue patents upon the application of "prowl-
ing squatters" (*Murphy v. Kirwan*, 103 Fed. 109; *Lamprey
v. State*, 52 Minn. 197, 38 Am. St. 541, 53 N. W. 1142, 18 L.

R. A. 677), the situation will become lamentable and exceedingly prejudicial and burdensome to settlers and *bona fide* home-builders. We cannot give our sanction to such a procedure.

We conclude that the patentees to the abutting upland fractional subdivisions took title to the middle or thread of the navigable channel of Snake river, and that the judgment of the trial court should accordingly be *affirmed,* with costs in favor of respondents.

Stewart, J., concurs.

Sullivan, C. J., dissents.

SULLIVAN, C. J., Dissenting.—I am unable to concur in the conclusion reached by my associates. My views on some of the questions involved are quite fully set forth in my dissenting opinion in the case of *Johnson v. Johnson,* 14 Ida. 561, 95 Pac. 499. In the case at bar there is involved an island that is not the bed of the stream, containing about 138 acres of dry land that does not overflow and has been surveyed by the land department of the United States government. I think the correct doctrine is announced by the supreme court of the United States in *Shively v. Bowlby,* 152 U. S. 1, 14 Sup. Ct. 548, 38 L. ed. 331. It is there held that the grants by Congress of portions of the public lands to settlers thereon, though bordering on or bounded by navigable waters, convey of their own force no title or right below high-water mark to the purchaser. Under the decisions of the supreme court of the United States, the title to a bed of a navigable stream remains in the United States until the territory in which the same is located is admitted as a state into the Union and then it goes to the state; but islands in navigable rivers are not thus transferred to the state, but remain a part of the public domain of the United States and subject to survey and sale under the laws of Congress and the rules and regulations of the land department of the government.

In *Kirwin v. Murphy,* 189 U. S. 35, 23 Sup. Ct. 599, 47 L. ed. 698, the court, speaking through Chief Justice Fuller, said:

"The administration of the public lands is vested in the land department, and its power in that regard cannot be divested by the fraudulent action of a subordinate officer, outside of his authority, and in violation of the statute. (Citing authorities.) The courts can neither correct nor make surveys. The power to do so is reposed in the political department of the government, and the land department, charged with the duty of surveying the public domain, must primarily determine what are public lands subject to survey and disposal under the public land laws."

In the case at bar, that department has decided that said island was public land by ordering it surveyed.

In *Niles v. Cedar Point Club*, 175 U. S. 300, 20 Sup. Ct. 124, 44 L. ed. 171, where it was contended that there was wonderful magic in a meander line and entitled the purchaser to a fraction bordered by a meander line to all of the land between it and the thread of the stream, the court, speaking through Justice Brewer, said:

"There is no such magic in a meandered line. All that can be said of it is that it is an irregular line which bounds a body of land, and beyond that boundary there may be found forest or prairie, land or water, government or Indian reservation."

In the case at bar, respondents claim title under patents from the government which describe certain fractional lots bordered by a meander line, which patents designate the acreage purchased from the government by the different patentees, and my associates hold that by reason of the purchase of said fractional lots, the purchasers are entitled to all of the land between the meander line and the thread of the stream in each respective grant, including said island containing more than 138 acres of land that does not overflow. I cannot consent to that conclusion.

In *Horne v. Smith*, 159 U. S. 40, 15 Sup. Ct. 988, 40 L. ed. 68, a case very much like the one under consideration, Mr. Justice Brewer said:

"Although it was unsurveyed, it does not follow that a patent for the surveyed tract adjoining carries with it the

land which, perhaps, ought to have been, but which was not in fact, surveyed. The patent conveys only the land which is surveyed, and when it is clear from the plat and the surveys that the tract surveyed terminated at a particular body of water, the patent carries no land beyond it.''

This island was public land of the United States, and the land department of the government was authorized to proceed whenever it may think best to do so, and survey it as a part of the public lands, which it has done.

In the case of *Gowdy v. Gilbert,* 19 Land Dec. 17, the Secretary of the Interior had before him the same question as is involved in this case, and it was held to the effect that a final decision of the department directing the survey of a tract of public land precludes the subsequent consideration of a claim thereto based on a riparian ownership. And in the consideration of the application of Kuhlman, 27 Land Dec. 68, for the survey of an island, it was held that an application for the survey of an island in a meandered and nonnavigable river may be allowed where it is apparent that the said island was improperly omitted from the official survey. In that case the island embraced about 100 acres and the Secretary of the Interior held, as has been held in other cases, that such a large acreage was in itself evidence that the island had been improperly omitted from the original survey.

In the case of *Johnson v. Hurst,* 10 Ida. 308, 77 Pac. 784, this court had under consideration the title to a small island and the court said:

''The government has never complained of any fraud having been practiced or any mistake having been made. It has never ordered a resurvey nor an additional survey and has never been heard to complain of the claims of the plaintiff.''

In the case at bar, the government has ordered and made a survey of the island in dispute.

In *Whitaker v. McBride,* 197 U. S. 510, 25 Sup. Ct. 530, 49 L. ed. 857, the court had under consideration a question very much like the one at bar, and said:

''Our conclusion, therefore, is that by the law of Nebraska, as interpreted by its highest court, the riparian proprietors

are the owners of the bed of a stream to the center of the channel; that the government, as original proprietor, has the right to survey and sell any lands, including islands in a river or other body of water; that if it omits to survey an island in a stream, and refuses, when its attention is called to the matter, to make any survey thereof, no citizen can overrule the action of the department, assume that the island ought to have been surveyed, and proceed to occupy it for the purpose of homestead or pre-emption entry. In such a case the rights of the riparian proprietors are to be preferred to the claims of the settler."

There the supreme court of the United States directly holds that the government, as original proprietor, has the right to survey and sell any land including islands in the rivers or other bodies of water, and if it omits to survey an island in a stream and refuses to do so when its attention is called to the matter, then the rights of the riparian proprietor are to be preferred to the claims of the settler. But in the case at bar, when the government's attention was called to the fact that this large island had not been surveyed, the department at once directed its survey, as it had a right to do. Neither the state nor the riparian owners took title to the beds of the stream nor to the islands, at least prior to the admission of Idaho as a state, and then not to the islands. (See *Granger v. Swart*, 1 Woolw. 88, Fed. Cas. No. 5685.)

In 1 Farnham on Waters, page 50, the author states the rule to be as follows:

"Islands formed in the stream before the admission of the state into the Union are subject to disposal by the federal government the same as other public lands. If they are formed after the admission of the state, the question whether they belong to the riparian owner, or are the property of the state, is governed by local law." The record clearly shows that this island was in existence at the time Idaho was admitted into the Union of states and long before and was occupied as early as 1881.

The judgment ought to be reversed.

Petition for rehearing denied.