## PACKER *v.* BIRD.

ERROR TO THE SUPREME COURT OF THE STATE OF CALIFORNIA.

No. 111: Submitted December 3, 1890. — Decided January 19, 1891.

The undoubted rule of the common law that the title of owners of land bordering on navigable rivers above the ebb and flow of the tide extends to the middle of the stream, having been adopted in some of the States, and not being recognized in other States, Federal Courts must construe grants of the general government without reference to the rules of construction adopted by the States for such grants by them.

Whatever incidents or rights attach to the ownership of property conveyed by the United States bordering on navigable streams, will be determined by the States in which it is situated, subject to the limitation that their rules do not impair the efficacy of the grant, or the use and enjoyment of the property by the grantee.

The legislation of Congress for the survey of the public lands recognizes the general rule as to the public interest in waters of navigable streams without reference to the existence or absence of the tide in them.

The highest court of California having decided that the Sacramento river being navigable in fact, a title upon it extends no farther than to the edge of the stream, this court accepts that decision as expressing the law of the State.

The plaintiff claimed land in California under a Mexican grant which was

confirmed by a decree of the District Court of the United States for the Northern District of California, in which the land was described as follows: "Commencing at the northerly boundary of said rancho, at a point on the Sacramento River just two leagues northerly from the rancheria called Lojot, and running southerly on the margin of said river to a point," etc. The survey under that decree was incorporated into the patent, and described the eastern boundary of the tract as commencing at a certain oak post "on the right bank of the Sacramento River," and thence "traversing the right bank of the Sacramento River down stream" certain courses and distances. *Held*, that the title under this patent did not extend beyond the edge of the stream, and that it did not include an island opposite the tract, and separated from it by a channel of the river which lay between it and the principal channel.

THIS was an action for the possession of an island, embracing about eighty acres of land, in the river Sacramento, within the county of Colusa, in the State of California. The plaintiff alleged ownership of the premises in 1867, and his continued ownership afterwards, the entry of the defendants thereon in January, 1883, without right or title, and their continued unlawful possession thereof ever since, to his damage of two hundred dollars. The answer of the defendants was a general denial of the allegations of the complaint. The issues were tried by the court, without the intervention of a jury, by stipulation of the parties. The court found for the defendants, and directed judgment in their favor. A motion for a new trial was denied, and, on appeal to the Supreme Court of the State the judgment and the order refusing a new trial were both affirmed. To review that judgment the case was brought to this court.

The river Sacramento is navigable from its mouth or outlet to a point above the premises in controversy. Indeed, it is one of the great rivers of the State, and is navigable over two hundred and fifty miles.

The muniments of title, introduced by the plaintiff, consisted of a patent of the United States, issued in December, 1857, to Francis Larkin and others, for a tract of land in the county of Colusa, known as the rancho of Larkin's children; a decree partitioning the land among the patentees, and intermediate conveyances from one of them to the plaintiff. In June, 1857, a survey of the land covered by the patent was made by the

proper officers of the United States, pursuant to a decree of the District Court of the United States for the Northern District of California, rendered in January, 1856, confirming an imperfect Mexican grant of the tract, and ascertaining and determining its location. That decree described the land as follows:

"Commencing at the northerly boundary line of said rancho, at *a point on the Sacramento River*, just two leagues northerly from the rancheria called Lojot, and running southerly *on the margin of said river*, to a point which is five leagues south of the place of beginning; thence west two leagues; thence north in a parallel line with said river, and two leagues therefrom, five leagues; and thence east two leagues to the place of beginning; and so as to contain the area of ten square leagues within said lines."

The survey, which was incorporated in the patent, described the eastern boundary line of the tract as commencing at a certain oak post "on the right bank of the Sacramento River," and thence "traversing the right bank of the Sacramento River down stream" certain courses and distances.

Among other things the court found that from 1853 to 1858, and both prior and subsequent thereto, the waters of the Sacramento River divided into two streams at the upper or northerly end of the island in controversy; that one of the streams flowed through a channel extending around the easterly side of the island, and the other through a channel extending around the westerly side; that during this period both of the channels were plain and well defined, and had high banks, and the waters of the river flowed and still continued to flow through both of them at all seasons of the year; that the two channels and streams of water reunited at the lower or southerly end of the island; and that each of the channels and streams constituted a part of the Sacramento River, which was navigable, "both in fact and by statute;" that during the greater portion of each year the channel on the westerly side of the land in dispute was navigable, and was during the period mentioned actually navigated; but that the usual and most direct route for steamers was along the channel running east of the island.

*Mr. W. C. Belcher* for plaintiff in error.

We contend that the land conveyed by the patent in question, extends *at least* to the margin of the navigable channel of the river; that the land in controversy is a part of the land so conveyed, unless it is separated from that land by a navigable channel of the river; and that the state court therefore erred in holding that it is not material whether the slough to the west of this tract is navigable or not navigable.

If the river mentioned in the patent were not navigable in law, the lands granted, being bounded by the "margin" of the river, would extend to the thread of the stream. *Ex parte Jennings*, 6 Cowen, 518; *S. C.* 16 Am. Dec. 447; *Jones* v. *Soulard*, 24 How. 41; *Howard* v. *Ingersoll*, 13 How. 381.

The doctrine of these cases includes cases like the present, where the stream, though navigable in fact, is above tidewater. But later cases in this court disregard that distinction, and hold that the title to lands bordering on streams navigable in fact, whether tidal or not, stops, under the acts of Congress, at the stream.

It is not necessary in this case to discuss this distinction. Treating this river as navigable in the common law sense, it is manifest that the grant in question extends to the *stream*, that the grantee is a riparian proprietor, with the right of access to the *channel*, and that there can be no vacant land left for appropriation between the river and the river boundary of such tract. *Railroad Co.* v. *Schurmeir*, 7 Wall. 272, 287; *County of St. Clair* v. *Lovingston*, 23 Wall. 46, 63.

This being so, it is clear that, unless plaintiff's land extends to the navigable channel, it is not bounded by the river at all. It is only the navigability of the river which prevents his title from running to the middle of the stream. But that very fact entitles him to access to the navigable channel, and to the right to construct landings and wharves for the convenience of commerce and navigation. If the "slough" on the west of this parcel of land is not navigable, and is yet the eastern boundary of plaintiff's land, it would follow that plaintiff is deprived of all access to the river for purposes of

commerce and navigation, and that there is vacant land left for appropriation between his land and the river; — neither of which things can legally be true. A slough of this character cannot be considered a part of the river, so as to constitute a boundary, unless it is itself navigable. This necessarily follows from the ruling in *Railroad Company* v. *Schurmeir*. It was there held that, by the terms of the acts of Congress regulating the survey of the public lands, the margin of a navigable river should constitute the boundary of lands bordering thereon. By this must be intended the navigable stream itself, not some unnavigable branch or fork of it. Indeed, when the boundaries of land are described as extending to a river, the main river, and not a branch, slough, or bayou, is the termination of those lines. *Graves* v. *Fisher*, 5 Greenl. 69.

The state court sought to distinguish this case from the Schurmeir case, saying: "The court in the case cited manifestly did not hold the land in controversy to be an island. The slough, so-called, in that case was not nor was it held to be a part of the Mississippi River."

This is, of course, true. But, when we examine the facts of that case, we find that the reasons for so holding apply equally to this case. The land in that case was a parcel which, at very low water, was separated from the main body by a slough or channel, twenty-eight feet wide, through which no water flowed, but in which water remained in pools; at medium water, the water flowed through the slough, making an island of the parcel; and, at high water, the whole parcel was submerged. No mention was made of any such channel in the official survey under which the patent was issued. It is evident that those facts correspond with those held by the state court in this case to be sufficient to prevent a recovery by plaintiff. The slough there was as much a part of the Mississippi River as the slough here is a part of the Sacramento River. Each of them was connected with the river at each end, and each received its water from the river. The reason why this court held the slough in the former case not to be a part of the Mississippi River, was because it was not navigable,

and because, if it were held to be the boundary, there would remain vacant land between the navigable stream and the land in terms bounded on that stream, thus cutting off the riparian owner from access to the stream. But that is the precise proposition which the state court held to be immaterial in this case; and, in so ruling, that court manifestly misconstrued the acts of Congress under which plaintiff's title was obtained.

Mr. *Charles N. Fox* for defendant in error.

Mr. Justice Field after stating the case as above reported, delivered the opinion of the court.

The question presented is, whether the patent of the United States, describing the eastern boundary of the land as commencing *at a point on the river*, which was on the right and west bank, and running southerly *on its margin*, embraces the island within it, or whether, notwithstanding the terms of apparent limitation of the eastern boundary to the margin of the river, the patent carries the title of the plaintiff holding under it to the middle of the stream. The contention of the plaintiff is that the land granted and patented, being bounded on the river, extends to the middle of the stream, and thus includes the island. It does not appear in the record that the waters of the river at the point where the island is situated are affected by the tides; but it is assumed that such is not the case. The contention of the plaintiff proceeds upon that assumption.

It is undoubtedly the rule of the common law that the title of owners of land bordering on rivers above the ebb and flow of the tide extends to the middle of the stream, but that where the waters of the river are affected by the tides, the title of such owners is limited to ordinary high-water mark. The title to land below that mark in such cases is vested in England in the Crown, and in this country in the State within whose boundaries the waters lie, private ownership of the soils under them being deemed inconsistent with the interest

of the public at large in their use for purposes of commerce. In England this limitation of the right of the riparian owner is confined to such navigable rivers as are affected by the tides, because there the ebb and flow of the tide constitute the usual test of the navigability of the streams. No rivers there, at least none of any considerable extent, are navigable in fact, which are not subject to the tides. In this country the situation is wholly different. Some of our rivers are navigable for many hundreds of miles above the limits of tidewater, and by vessels larger than any which sailed on the seas when the common law rule was established. A different test must, therefore, be sought to determine the navigability of our rivers, with the consequent rights both to the public and the riparian owner, and such test is found in their navigable capacity. Those rivers are regarded as public navigable rivers in law which are navigable in fact. And, as said in the case of *The Daniel Ball,* 10 Wall. 557, 563 : "they are navigable in fact when they are used, or are susceptible of being used, in their ordinary condition, as highways for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water."

The same reasons, therefore, exist in this country for the exclusion of the right of private ownership over the soil under navigable waters when they are susceptible of being used as highways of commerce in the ordinary modes of trade and travel on water, as when their navigability is determined by the tidal test. It is, indeed, the susceptibility to use as highways of commerce which gives sanction to the public right of control over navigation upon them, and consequently to the exclusion of private ownership, either of the waters or the soils under them. The common law doctrine on this subject, prevailing in England, is held in some of the States, but in a large number has been considered as inapplicable to the navigable waters of the country, or, even if prevailing for a time has given way, or been greatly modified, under the different conditions there.

It has been adopted in most, if not all, of the New England States. In New York, in the earlier cases, it was considered

as in force; and in *Ex parte Jennings*, 6 Cowen, 518, was formally declared. There a patent of lands by the State, bounded *on the margin of a river* above tide-water, was held to carry the land granted to the middle of the stream, the court stating that the rule was otherwise where the land was bounded on a navigable river, but adding that by the term "navigable river," the law did not mean such as is navigable in common parlance; that the smallest creek might be so to a certain extent as well as the largest river, without being legally a navigable stream; and that the term has in law a technical meaning, and applies to all streams, rivers or arms of the sea where the tide ebbs and flows. This doctrine was modified and finally overruled in subsequent cases.

In *People* v. *Canal Appraisers*, 33 N. Y. 461, 499, the whole subject of the rights of riparian owners on navigable streams, whether affected or not by the ebb and flow of the tide, was elaborately considered, with a careful examination of the adjudged cases in the different States, and the conclusion reached was against the applicability of the common law rule in this country. The court in its opinion refers to the great embarrassment experienced by courts, judges and text-writers in applying the principles of the common law to the waters of this continent, the variant conclusions reached by them, and the contradictory and unsatisfactory reasons given for the results arrived at; and, after tracing the progress of judicial discussion of the doctrine of the common law on the subject, it expresses satisfaction that the discussion had culminated in the decision by the court of ultimate appeal repudiating the applicability of the doctrine to the rivers of that State, and establishing what it terms "the better doctrine of the civil law."

In Pennsylvania the common law doctrine was never recognized. In *Monongahela Bridge Co.* v. *Kirk*, 46 Penn. St. 112, 120, the Supreme Court of that State, in holding that the river Monongahela was a navigable stream, and that its soil up to low-water mark, and the river itself, were the property of the Commonwealth, said:

"We are aware that by the common law of England such streams as the Mississippi, the Missouri, the rivers Amazon and

Platte, the Rhine, the Danube, the Po, the Nile, the Euphrates, the Ganges and the Indus, were not navigable rivers, but were the subject of private property, whilst an insignificant creek in a small island was elevated to the dignity of a public river, because it was so near the ocean that the tide ebbed and flowed up the whole of its petty course. The Roman law, which has pervaded Continental Europe, and which took its rise in a country where there was a tideless sea, recognized all rivers as navigable which were really so, and this common sense view was adopted by the early founders of Pennsylvania, whose province was intersected by large and valuable streams, some of which are a mile in breadth."

In the courts of the Western States there is much conflict of opinion, some, like the courts of Illinois, adopting the common law rule to its fullest extent ; and others, like the courts of Iowa, repudiating its application in determining the navigability of the great rivers, and the rights of riparian owners upon them. A very elaborate consideration of the adjudged cases on the subject is found in *McManus* v. *Carmichael*, 3 Iowa, 1. Indeed, the opinion of the Supreme Court of Iowa in that case, and the opinion of the Court of Appeals of New York in *People* v. *Canal Appraisers*, above cited, contain an exhaustive and instructive consideration of the whole subject, with a careful review of the decisions of the courts of the States. In this case we accept the view of the Supreme Court of California in its opinion as expressing the law of that State, "that the Sacramento River being navigable in fact, the title of the plaintiff extends no farther than the edge of the stream." *Lux* v. *Haggin*, 69 California, 255.

The courts of the United States will construe the grants of the general government without reference to the rules of construction adopted by the States for their grants ; but whatever incidents or rights attach to the ownership of property conveyed by the government will be determined by the States, subject to the condition that their rules do not impair the efficacy of the grants or the use and enjoyment of the property by the grantee. As an incident of such ownership the right of the riparian owner, where the waters are above the influ-

ence of the tide, will be limited according to the law of the State, either to low or high-water mark, or will extend to the middle of the stream. It is, therefore, important to ascertain and determine what view will be taken by the courts of the United States in the construction of grants of the general government in conferring ownership, when they embrace lands bordering on navigable waters above the influence of the tide. How far will such grants be deemed to extend into the water, if at all? From the conflicting decisions of the state courts cited, it is evident that there is no such general law on the subject as will be deemed to control their construction.

In the courts of the United States the rule of the common law in determining the navigability of rivers, and the effect thereof upon the jurisdiction of the court, has been disregarded since the decision of the case of *The Genesee Chief*, 12 How. 443, 455. This court there said that there was nothing in the ebb and flow of the tide which made a stream suitable for admiralty jurisdiction, nor anything in the absence of the tide that rendered it unfit; that if a stream was a public navigable water, on which commerce was carried on between different States and nations, the reason for the jurisdiction was precisely the same; and that any distinction made on that account was merely arbitrary, without any foundation in reason, and indeed would seem to be inconsistent with it. The eminent Chief Justice who delivered the opinion in that case explained how in England the ebb and flow of the tide became the test of the navigability of a stream, as we have stated it above; that there tide-waters, with a few small and unimportant exceptions, meant nothing more than public rivers as contradistinguished from private ones; and that hence arose the doctrine of admiralty jurisdiction, which was confined to the ebb and flow of the tide; in other words, to public navigable waters. He then added: "As the English definition was adopted in our courts, and constantly used in judicial proceedings and forms of pleading, borrowed from England, the public character of the river was in process of time lost sight of, and the jurisdiction of the admiralty treated as if it was limited by the tide. The description of a public navigable river was sub-

stituted in the place of the thing intended to be described. And under the natural influence of precedents and established forms, a definition originally correct was adhered to and acted on, after it had ceased, from a change in circumstances, to be the true description of public waters."

In *Barney* v. *Keokuk*, 94 U. S. 324, 338, the same subject in some of its features was under consideration in this court, and the language used is especially applicable to cases like the one before us. That action was against the city of Keokuk and a steam packet company, to recover the possession of certain premises occupied by them with railroad tracks, buildings and sheds on the bank of the Mississippi River, and in that city. The court, in considering the question presented, observed that "the confusion of navigable with tide-water, found in the monuments of the common law, long prevailed in this country, notwithstanding the broad differences existing between the extent and topography of the British Island and that of the American Continent. It had the influence for two generations of excluding the admiralty jurisdiction from our great rivers and inland seas; and under the like influence it laid the foundation in many States of doctrines with regard to the ownership of the soil in navigable waters above tide-water at variance with sound principles of public policy. Whether, as rules of property, it would now be safe to change these doctrines where they have been applied, as before remarked, is for the several States themselves to determine. If they choose to resign to the riparian proprietor rights which properly belong to them in their sovereign capacity, it is not for others to raise objections. In our view of the subject the correct principle was laid down in *Martin* v. *Waddell,* 16 Pet. 367; *Pollard's Lessee* v. *Hagan,* 3 How. 212; and *Goodtitle* v. *Kibbe,* 9 How. 471. These cases related to tide-water, it is true; but they enunciate principles which are equally applicable to all navigable waters. And since this court, in the case of *The Genesee Chief*, 12 How. 443, has declared that the great lakes and other navigable waters of the country, above as well as below the flow of the tide, are, in the strictest sense, entitled to the denomination of navigable waters, and amenable to the

admiralty jurisdiction, there seems to be no sound reason for adhering to the old rule as to the proprietorship of the beds and shores of such waters. It properly belongs to the States by their inherent sovereignty, and the United States has wisely abstained from extending (if it could extend) its survey and grants beyond the limits of high water."

The legislation of Congress for the survey of the public lands recognizes the general rule as to the public interest in waters of navigable streams without reference to the existence or absence of the tide in them. As early as 1796, in an act providing for the sale of such lands in the territory northwest of the river Ohio and above the mouth of Kentucky River, Congress declared "that all navigable rivers within the territory to be disposed of by virtue of the act shall be deemed to be and remain public highways; and that in all cases where the opposite banks of any stream, not navigable, shall belong to different persons, the stream and the bed thereof shall become common to both." Act of May 18, 1796, c. 29, § 9, 1 Stat. 468.

In *Railroad Company* v. *Schurmeir*, 7 Wall. 272, 288, the court said that in view of this legislation and other similar acts it did not "hesitate to decide, that Congress, in making a distinction between streams navigable and those not navigable, intended to provide that the common law rules of riparian ownership should apply to lands bordering on the latter, but that the title to lands bordering on navigable streams should stop at the stream, and that all such streams should be deemed to be and remain public highways." The same rule applies when the survey is made and the patent is issued upon a confirmation of a previously existing right or equity of the patentee to the lands, which in the absence of such right or equity would belong absolutely to the United States, unless the claim confirmed in terms embraces the land under the waters of the stream.

The language of the decree of confirmation describing the tract confirmed, and the language of the survey incorporated in the patent, both clearly indicate that the margin of the river was intended as the eastern boundary of the tract con-

firmed, and we find nothing either in any act of Congress or in any decision of the Federal courts which would enlarge the effect of the grant. The title of one claiming under the patent does not, therefore, extend beyond the edge of the stream.

The judgment of the court below is accordingly

*Affirmed*