DONOVAN-HOPKA-NINNEMAN CO., Limited, et al. v. HOPE LUMBER MFG. CO.

(Circuit Court of Appeals, Ninth Circuit. March 11, 1912.)

No. 1,925.

**1. PUBLIC LANDS (§ 114*)—GRANTS—RIPARIAN RIGHTS.**

Rights of owners of lands bordering an inland navigable lake, being governed by the laws of the state, subject to the paramount public right of navigation, a federal patent to such lands does not convey anything below the ordinary high-water mark.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 314–322; Dec. Dig. § 114.*]

**2. NAVIGABLE WATERS (§ 36*)—WATERS AND WATER COURSES (§ 89*)—RIPARIAN RIGHTS.**

In Idaho, a riparian owner on navigable water takes title to the thread of the stream, or lake, subject to the public right of navigation.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. §§ 180–200; Dec. Dig. § 36;* Boundaries, Cent. Dig. §§ 108–112, 115–117, 121, 122; Waters and Water Courses, Cent. Dig. §§ 91, 92; Dec. Dig. § 89.*]

**3. NAVIGABLE WATERS (§ 46*)—RIPARIAN RIGHTS—SEPARABLE CHARACTER.**

Riparian rights incident to ownership of lands in Idaho bordering on a navigable lake are separable from the lands by conveyance, condemnation, relinquishment, or prescription.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. §§ 283–293; Dec. Dig. § 46.*]

---

4. NAVIGABLE WATERS (§ 46*)—RIPARIAN RIGHTS—ESTOPPEL.

Plaintiff is not estopped to claim riparian rights conveyed apart from the lands to which they were appurtenant, where each party had notice of the other's claims and of their dispute as to what their legal rights were.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. §§ 283–293; Dec. Dig. § 46.*]

5. NAVIGABLE WATERS (§ 37*)—RIPARIAN RIGHTS—CONVEYANCE.

A deed to all the riparian and water rights in front of and belonging to specified lots bordering a navigable lake, fixing the average high-water line for five years as the division line, passed title to the soil under the lake to the middle thereof.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. §§ 201–227, 285; Dec. Dig. § 37;* Boundaries, Cent. Dig. §§ 108–112, 115–117, 121, 122.]

6. NAVIGABLE WATERS (§ 36*)—RIPARIAN RIGHTS—EJECTMENT.

Ejectment lies to oust possession of the soil under a lake and structures erected thereon.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. §§ 180–200; Dec. Dig. § 36.*]

In Error to the Circuit Court of the United States for the District of Idaho.

Action by the Hope Lumber Manufacturing Company against the Donovan-Hopka-Ninneman Company, Limited, and others. Judgment for plaintiff, and defendants bring error. Affirmed.

The defendant in error, a corporation of the state of Montana, was the plaintiff in the court below. The individual plaintiffs in error were citizens of the state of Idaho, of which state the Donovan-Hopka-Ninneman Company, Limited, was a corporation and also a citizen. The complaint in the action contained two counts, both of which set forth the jurisdictional facts and that the plaintiff had complied with the laws of the state of Idaho authorizing it to own and hold property and to carry on and conduct business in that state, and the first count of which also alleged: That the plaintiff ever since January 2, 1908, has been the owner and entitled to the possession and exclusive use and enjoyment "of the following described real estate situated in the county of Bonner, state of Idaho, and particularly described as follows, to wit: All the riparian and water rights and privileges in front of and appurtenant to lots five (5) and six (6), in section one (1), township fifty-six (56) north of range one (1) east of the Boise meridian, and all those portions of said lots five (5) and six (6), aforesaid, lying below the average of high-water mark on said lots, the said lots five and six forming a portion of the east shore of Lake Pend d'Oreille, in the said county of Bonner, state of Idaho, which said Lake Pend d'Oreille is now, and at all times has been a fresh-water navigable lake. That the said riparian rights and privileges so owned by this plaintiff include the right and privilege to exclusively use and enjoy the lands bordering on said lake below the high-water mark of said lake, and extending out into the said lake so far as the same may without interfering with or obstructing the free navigation of said lake by the public, and include the right to use the waters of said lake in front of said land for all purposes, and in such manner as a riparian proprietor has the right to use the same. That the said high-water mark to which the rights of this plaintiff in front of said premises extended during said times, and now extend, is the average of the high-water line during the five years prior and next preceding the 25th day of September, 1901."

It is next alleged in the first count of the complaint that on or about the 3d day of February, 1909, while the plaintiff was so the owner, and in, and entitled to the exclusive possession and enjoyment of the properties, rights, and privileges above described, the defendants to the action "entered upon the

said waters and lands lying beneath the said lake and below said high-water mark, in front of said lots 5 and 6, and wrongfully and unlawfully ejected and ousted plaintiff therefrom," and proceeded to erect a mill, booms, piers, tramways, and other things thereon, and have ever since wrongfully withheld the possession of the premises from the plaintiff, to its damage in the sum of $10,000.

The prayer of the first count is for the recovery of the possession of the premises and rights described, and for the amount of damages alleged and costs.

In the second count the plaintiff made substantially the same allegations in respect to its ownership of the property rights and privileges described in the first count, and further alleged that on or about February 3, 1909, the defendants wrongfully and against the will of the plaintiff "entered upon the said waters of Pend d'Oreille Lake lying in front of the said lots 5 and 6 above described, and being the waters upon which plaintiff owned and possessed the rights above named, and upon the lands lying below the high-water mark, and the waters in front of said land, and proceeded to use the same, and to drive piling into the said waters and land beneath the same, and to construct log booms thereon, and that ever since said last-named date the said defendants have continued to unlawfully enter and trespass upon the said lands and waters, and upon plaintiff's rights therein, in the manner aforesaid," to the plaintiff's damage in the sum of $10,000, for which the plaintiff prayed judgment with its costs.

After the overruling of the defendants' demurrer to the complaint, they filed an answer thereto, by which they put in issue the plaintiff's alleged ownership of the property and rights in question, and their ejectment of the plaintiff therefrom, or any wrongful or unlawful entry, although they admit in their answer that they did enter upon and use the property in question. By their answer they also set up as affirmative defenses that the deed under which the plaintiff claims title was and is void, and that the plaintiff had no easement or other right in or to any part of the said lots 5 and 6. The answer further alleged that the defendants' predecessors in interest purchased on the 14th day of April, 1902, from one F. B. Carter, the then owner of lots 5 and 6 referred to in the complaint, that portion thereof described as follows, to wit: "Thirty-three acres situated on the southwest side of the Northern Pacific Railroad Company's right of way and bounded on the southwest by Lake Pend d'Oreille, being all the lake shore and lake front of said lots bordering upon or being in said Lake Pend d'Oreille."

The answer next alleged that the defendants' predecessors in interest, with the knowledge, consent, and acquiescence of the plaintiff and its predecessors in interest, erected a sawmill of large value upon a portion of the said lots so purchased by them and a boom in front of the defendants' said property, which boom it was necessary to fasten to the shore, and which boom is being maintained and operated by the defendants with the consent of the War Department of the United States; that the plaintiff and its predecessors in interest had full knowledge of the construction and maintenance of both mill and boom and made no objection thereto, but, on the contrary, acquiesced therein.

The plaintiff put in issue the affirmative allegations of the answer, and the cause came on for trial before the court with a jury. During the examination of the witness Donovan, the defendant was permitted by the court to amend its answer by setting up as a further defense to the action the following:

"That at all the times and dates mentioned in the complaint and answer herein the state of Idaho was the owner of all the water and water rights in the state of Idaho, save and except as and when said water and water rights or portions thereof were or are appropriated and actually used for a beneficial purpose.

"That at all the times and dates mentioned in the complaint and answer herein defendant corporation and its predecessors in interest were, and said corporation now is, the owner of all that portion of lots 5 and 6 mentioned and described in the pleadings herein, bordering on Lake Pend d'Oreille and between the average or ordinary high-water mark and the right of way of

the Northern Pacific Railroad Company (which right of way is a considerable distance from the shore of said lake) and the defendant corporation now is the owner, and the predecessors of defendant corporation have at all times been the owners, of all of said lots below said average or ordinary high-water mark, including the bed of said lake and all of said lots under water at any time, and the defendant corporation and its predecessors in interest are the only persons having any rights to the use of the soil of said lots or of the bed of the lake, or any part or portion of said lots extending into said lake, for the purpose of having or maintaining a log or other boom, piling, sawmill, or any other matter or thing.

"That the predecessors in interest of defendant corporation made use of the water of said lake in front of and over a portion of said lots for booming and floating logs in the year 1903. That defendant corporation, in the latter part of the year 1907, commenced the construction of a sawmill on a portion of said lot 6, and completed said sawmill in the early part of the year 1908, and floated large quantities of logs on and in the water of said lake and in front of and over portions of said lots, and ran and operated said mill from the date of its completion until it burned, during the night of August 8, 1908. That during the years 1908, 1909, and 1910, and the latter part of the year 1907, defendant corporation maintained log booms in the water covering portions of said lots. That in the year 1908 defendant corporation put piling in said water and near the ordinary low-water mark of and on said lots 5 and 6, and around said mill. That as soon as defendant corporation was financially able to so do, it constructed a new mill on the site of the first mill, and put piling in said lake, and on said lots some distance from the shore, for boom purposes, and to facilitate the operation of said mill. That no other person or corporation has ever used the water or appropriated the water of said lake within the area between the outer piling and the shore of or on said lots 5 and 6, for the purpose, or any purpose, to which defendant corporation has used said water. That the water or area last above mentioned is not in excess of that reasonably necessary for the operation of said mill, or the uses to which defendant corporation has put said water.

"That defendant corporation intended to and has appropriated the water, water rights, and right to use the water of said lake on or in front of portions of said lots 5 and 6 out to and beyond said outer piling, and has put said water and water area to a beneficial and valuable use.

"That in the construction of said mills and the booms, pilings, and improvements, and appropriating and putting said water to a beneficial use, defendant corporation has expended about $20,000."

Upon the conclusion of the evidence in the case the trial court instructed the jury to return a verdict for the plaintiff upon both causes of action set out in the complaint, but submitted to it the question as to the amount of damages sustained by the plaintiff. The jury returned a verdict for the plaintiff as directed and fixed the amount of damages at the nominal sum of $1, in accordance with which verdict judgment was entered.

H. M. Stephens and Peter Johnson, for plaintiffs in error.

Henry C. Stiff, Thomas C. Marshall, Elmer E. Hershey, C. F. Kelley, and L. O. Evans, for defendant in error.

Before GILBERT and ROSS, Circuit Judges, and WOLVERTON, District Judge.

ROSS, Circuit Judge (after stating the facts as above). The defendant in error (plaintiff below) acquired its alleged rights in and to the property in question under a deed from one Kenneth Ross, who acquired whatever rights he had thereto under a deed to him from an Idaho corporation styled Hope Lumber Company, which company acquired its rights in the property, if any, under a deed executed to it on the 25th day of September, 1901, by Frank B. Carter, who under-

took to convey thereby to the Hope Lumber Company "all the following described lots, pieces, or parcels of land, situated in the county of Kootenai and state of Idaho and known and described as follows, to wit: All the riparian and water right in front of and belonging to lots (5) five and (6) six, Sec. (1) one, township (56) fifty-six north of range (1) one east, and it is agreed that the average of high-water line for the past (5) five years shall be the division line."

Carter's rights in and to the property in question, whatever they were, were derived solely by virtue of a deed to him made by the Northern Pacific Railroad Company, which company had theretofore received a patent from the United States conveying to it lots 5 and 6 of the section mentioned under and by virtue of the grant made to it by Congress; one of the boundaries of the lots being Lake Pend d'Oreille, which is a fresh-water navigable lake, situated wholly within the state of Idaho. In his deed to the Hope Lumber Company Carter did not, as will be seen from the description above quoted, convey any portion of lots 5 and 6, but, on the contrary, retained them and subsequently conveyed portions thereof to the predecessors in interest of the plaintiff in error (defendant below), as will subsequently be shown. He undertook to convey to the Hope Lumber Company only "all the riparian and water right in front of and belonging to" lots 5 and 6; the deed reciting that "it is agreed that the average of high-water line for the past (5) five years shall be the division line."

Some time after the deed made by Carter to the Hope Lumber Company and on April 14, 1902, he executed a deed (confirmed by a still later deed) conveying all those portions of the said lots 5 and 6 lying south of the Northern Pacific Railroad Company's right of way (being those portions thereof bordering on the Lake Pend d'Oreille) to Donovan, Hopka & Ninneman, at the time being a mercantile firm in Hope, Idaho, and being the predecessors in interest of the plaintiff in error, and under which deed the plaintiff in error and its predecessors in interest entered upon the soil and waters in front of lots 5 and 6 and constructed a mill, and afterwards a second mill (the first having been burned), a wharf, and other structures used in the manufacture, sale, and shipment of lumber.

There was conflicting evidence given on behalf of the respective parties regarding the average high-water line of the lake in front of lots 5 and 6 during the five years immediately preceding the date of the execution of the deed from Carter to the Hope Lumber Company; the highest line being given as 17 feet above and the lowest 14 feet above the line of extreme low water. And there was evidence also given to the effect that the extreme low-water line was fixed by the elevation of the lake, given as 2,051 feet.

On the trial the court expressed doubt as to whether the plaintiff could maintain ejectment, saying:

"The evidence is not clearly in harmony with the description as set forth in the complaint. There is an express allegation of the conveyance of the soil, and I overruled the demurrer on that ground. The construction of the deed is not free from grave difficulty, but I have concluded to take the view that it conveys all the interest which the grantor had, in the boundary lines of the description. Taking the entire deed together, my conclusion is that

such was the intention of the parties fairly to be gathered from the deed; but the conclusion is not free from difficulty."

The court finally gave to the jury these two instructions:

"Gentlemen of the jury, in the view which I have taken of the law of this case, from the undisputed testimony, it becomes my duty to say to you that the plaintiff is entitled to recover upon the first cause of action. A form of verdict has been prepared, which it will be your duty to find and the duty of your foreman to sign: 'We, the jury impaneled and sworn to try the above-entitled cause, find for the plaintiff on all the material issues on the first cause of action, and find that the "average of high-water line" referred to in the deed offered in evidence by plaintiff, and referred to and alleged in the complaint as a part of the description of the premises in controversy, as follows, to-wit, at an elevation of 2,062 feet above sea level.' So that so far as this first phase of the case is concerned, I am assuming the responsibility myself and will relieve you from any difficulty. It will be your duty to return this verdict.

"Now, as to the second cause of action, the plaintiff asks for damages for being deprived of the use of the property in controversy during the period elapsing from the time it was excluded from the use thereof (I think it is claimed by the plaintiff that it was some time in February, 1909, but the date is for you to determine) from the date when it was excluded from the use of this property, if it was excluded (and that is for you to find), up until the date of this suit, which is June 15, 1909. Your verdict upon that cause of action cannot exceed $5,000, which, as I understand, is the highest estimate any witness placed upon the damages, and cannot be less than $1. So that your verdict must be in favor of the plaintiff for at least $1, and cannot exceed $5,000."

As has been stated, the jury returned a verdict for the plaintiff as directed and fixed its damage at the nominal sum of $1.

[1] By its patent the United States did not undertake to convey anything below ordinary high-water mark. Barney v. Keokuk, 94 U. S. 324, 338, 24 L. Ed. 224; Packer v. Bird, 137 U. S. 661, 11 Sup. Ct. 210, 34 L. Ed. 819. The incidental riparian rights to the waters in front of those lots and to the use of the soil under them for certain purposes, the grantee of such title held and enjoyed as owner of the upland only. The law in respect to the rights that accrue to the owner of lands in this country bordering on navigable waters beyond the reach of the tides, whether of rivers or lakes, is well settled. Such rights are governed by the laws of the several states, subject to the paramount public right of navigation. Weems Steamboat Co. v. People's Company, 214 U. S. 345, 29 Sup. Ct. 661, 53 L. Ed. 1024, 16 Ann. Cas. 1222; Shively v. Bowlby, 152 U. S. 1, 14 Sup. Ct. 548, 38 L. Ed. 331; Yates v. Milwaukee, 10 Wall. 497, 19 L. Ed. 984; and the numerous cases cited in the opinions in those cases.

"The courts of the United States will construe the grants of the general government without reference to the rules of construction adopted by the states for their grants; but whatever incidents or rights attach to the ownership of property conveyed by the government will be determined by the states subject to the condition that their rules do not impair the efficacy of the grants or the use and enjoyment of the property by the grantee. As an incident of such ownership the right of the riparian owner, where the waters are above the influence of the tides, will be limited according to the law of the state, either to low or high water mark, or will extend to the middle of the stream." Packer v. Bird, 137 U. S. 661–669, 11. Sup. Ct. 210, 212, 34 L. Ed. 819.

[2] The law of the state of Idaho, as established by the Supreme Court of that state, is that the riparian owner upon the streams and lakes of Idaho (all of which are unaffected by the tides), whether navigable or nonnavigable, takes title to the thread of the stream or lake, as the case may be, subject to the public right of navigation. Johnson v. Johnson, 14 Idaho, 561, 95 Pac. 499, 24 L. R. A. (N. S.) 1240; Lattig v. Scott, 17 Idaho, 506, 107 Pac. 47.

It necessarily results, therefore, that it must be here held that Carter got, as an incident of the conveyance of lots 5 and 6 by the Northern Pacific Railroad Company to him under its patent from the government, title to the waters in front of those lots and to the soil covered by them to the thread of the lake, subject to the public right of navigation. But such title he received and held only as riparian owner of lots 5 and 6 and as a mere incident of the title to those lots conveyed by the United States.

[3] The real questions in the case, therefore, are: First, whether those incidental and appurtenant rights were separable from the land to which they were thus attached, and, if so, whether they passed by the deed executed by Carter to the Hope Lumber Company; in which event the further questions of estoppel and the right of the plaintiff to maintain the action of ejectment.

In support of their contention that the incidental and appurtenant rights referred to were inseparable from the riparian land, the counsel for the plaintiffs in error cite, among other cases, Illinois Central Railroad Co. v. Illinois, 146 U. S. 387–445, 13 Sup. Ct. 110, 36 L. Ed. 1018, and Potomac Steamboat Co. v. Upper Potomac S. Co., 109 U. S. 672, 3 Sup. Ct. 445, 4 Sup. Ct. 15, 27 L. Ed. 1070.

In the case of Illinois Central Railroad Co. v. Illinois, 146 U. S. 387–445, 13 Sup. Ct. 110, 115 (36 L. Ed. 1018), the Supreme Court said:

"The construction of a pier or the extension of any land into navigable waters for a railroad or other purposes, by one not the owner of lands on the shore, does not give the builder of such pier or extension, whether an individual or corporation, any riparian rights. Those rights are incident to riparian ownership. They exist with such ownership and pass with the transfer of the land. And the land must not only be contiguous to the water, but in contact with it. Proximity without contact is insufficient. The riparian right attaches to land on the border of navigable water without any declaration to that effect from the former owner, and its designation in a conveyance by him would be surplusage. See Gould on Waters, § 148, and authorities there cited.'

"The riparian proprietor is entitled, among other rights, as held in Yates v. Milwaukee, 10 Wall. 497, 504 [19 L. Ed. 984], to access to the navigable part of the water on the front of which lies his land, and for that purpose to make a landing, wharf, or pier for his own use or for the use of the public, subject to such general rules and regulations as the Legislature may prescribe for the protection of the rights of the public."

The case of Potomac Steamboat Co. v. Upper Potomac S. Co., 109 U. S. 672, 3 Sup. Ct. 445, 4 Sup. Ct. 15, 27 L. Ed. 1070, was a bill in equity to restrain the defendants below, who were the appellees in the Supreme Court, from constructing piers and docks on the Potomac river, at the city of Washington. The plaintiffs, being in possession of a tract of land bounded by Water street, which was on the margin of

the river, claimed that the riparian rights on the side of the street opposite to their tract attached to it. The defendants denied the plaintiffs' title to such riparian rights, and justified their own acts under a license from the commissioners of the District of Columbia, who claimed title to the river front and riparian rights through deeds vesting the fee simple of Water street, in the city of Washington, in the United States. In the course of its opinion, the court said:

"The decisive circumstance in the present case is that the United States became the riparian proprietor, and succeeded to all the riparian rights of Notley Young, by becoming the owner in fee simple absolute of the strip of land that adjoined the river, and intervened between it and what remained to the original proprietor, Notley Young, after that conveyance; and the successors to his title had no other or greater rights in Water street, or the land on which it was laid out and eventually made, than any other individual members of the public. While it remained a street, it was subject to their use as a highway merely, over which to pass and repass, and without the consent of the United States as proprietor was subject to no private use whatever. The right of wharfage remained appurtenant to it, because, as land adjacent to the river, that right was annexed to it by law, and could be exercised on it by the proprietor; but, was severed, by the severance of the title, from the remainder of the original tract, to the whole of which it had formerly pertained."

These decisions fall far short of holding that such riparian rights cannot be severed from the riparian land and conveyed by its owner to third parties while retaining the land to which they were theretofore appurtenant.

The counsel for the plaintiffs in error also cite in support of their contention the case of Lake Superior Land Co. v. Emerson et al., 38 Minn. 406, 38 N. W. 200, 8 Am. St. Rep. 679, in which both parties claimed under the same original grantor, who owned a tract of land in Minnesota bordering on Lake Superior, which, under the law of that state, extended only to low-water mark; the soil under the water below that mark being the property of the state. The court in that case did distinctly hold that such riparian and appurtenant rights were not separable from the riparian land out of which they grew. "Riparian rights incident or appurtenant to no land cannot exist," said the court. The first decision of the same court in the subsequent case of Hanford et al. v. St. Paul & D. R. Co., 43 Minn. 104, 42 N. W. 596, 7 L. R. A. 722, was to the same effect; but upon full reconsideration of the last-mentioned case, reported in 44 N. W. 1144, the court overruled its former decisions, and after reviewing a large number of cases said, among other things:

"We have thus considered: That the riparian proprietor has the exclusive right—absolute, as respects every one but the state, and limited only by the public interests of the state for purposes connected with navigation—to improve, reclaim, and occupy the submerged land, out to the point of navigability, for any private purpose, as he might do if it were his separate estate; that this right, even though it may never have been exercised, is recognized and protected by the law as property, of which he cannot be deprived even by the state without just compensation. That the enjoyment of the right—the use of the premises—need not be associated with the use of the upland. That it is for the interest of the state that such waste lands be improved and rendered profitable, while the state is not concerned as to whether the owner of the adjacent upland, or some person to whom he may release his right, make the improvement and enjoy the private benefit. That the rights of other per-

sons are not involved in the question. That when the land has been reclaimed it may be conveyed, according to most of the authorities, apart from the original upland. And that, according to other authorities, the riparian right may be transferred to and enjoyed by the owner of the next adjacent riparian estate. From these considerations, as well as from the authorities cited bearing directly upon the question, we think that the quality of alienability should be deemed to belong to this kind of property, as it does to property in general. See opinion of Bramwell, B., in Nuttall v. Bracewell, L. R. 2 Exch. 1, 11. The only reason opposed to this is the technical one that the right grows out of, and, until severed, is incident to, a riparian estate. We have come to feel that this is unsatisfactory, as a reason why such property should be deemed inseparable from the parent estate, and incapable of a separate existence. If the right in question were created out of, or enjoyed at the expense of, some other estate or property, and were measured and limited by the needs or use peculiar to the riparian estate to which it is annexed, there would be ground for others to urge that the right could not be changed or transferred so as to enlarge the scope of a grant or contract, or so as to prejudice the party complaining. But no such conditions exist. The rights of no one are affected by allowing the riparian owner to convey away this part of his property, as he may his other property. It is only an abstract question whether the right originating in custom, and having originally attached as an incident to his riparian lands, may now be sold and conveyed, and be enjoyed by the purchaser. It is for the interest of the riparian owner that he be allowed to dispose of or use his private property at his own discretion. It is for the interest of the public that such property be subject to purchase and use, where the owner may be incapable of improving it. No one is interested in opposing such unrestricted alienability and use. Although we have become convinced that the better reason is opposed to our former decision upon this point in Land Co. v. Emerson, 38 Minn. 406, 38 N. W. 200, 8 Am. St. Rep. 679, we should have deemed it better that a rule of property, although so recently declared, should not be disturbed, were it not that it is supposed that the result of that decision, if adhered to, would be very seriously prejudicial to the tenure of a large amount of very valuable property, which for a long time has been deemed and treated as alienable and enjoyable apart from the riparian lands, and which, according to our present opinion, was rightfully so treated prior to our decision in the Emerson Case."

While there is undoubtedly some conflict in the authorities upon the subject, the decided weight of authority is to the effect that the incidental and riparian rights of the riparian proprietor referred to may be severed from the riparian land by grant, by condemnation, by relinquishment, or by prescription. See the large number of cases cited in Farnam on Water Rights, vol. 3, § 724 et seq., including the cases of Gould v. Stafford, 91 Cal. 146, 27 Pac. 543, McCann v. Oregon R. & N. Co., 13 Or. 455, 11 Pac. 236, Parker v. West Coast Packing Co., 17 Or. 510, 21 Pac. 822, 5 L. R. A. 61, and Welch v. Oregon R. & N. Co., 34 Or. 447, 56 Pac. 417.

[4-6] In respect to the question of estoppel, we are of the opinion that the court below was right in its conclusion that the plaintiff was not estopped from the assertion of its rights, for the reason that the record shows that each of the parties to the action had not only constructive but actual notice of the claims of the other, and actual knowledge of the dispute as to what the law governing the case really was and took the chance of the result of the controversy. And since by virtue of the law of the state of Idaho, as has been above shown, the common grantor of the respective parties to the action took title to the soil in front of lots 5 and 6 to the middle of the lake, subject to the public right of navigation, the deed from Carter to the plaintiff's

predecessor in interest passed his title to such soil below the high-water mark therein designated, for which, together with the physical structures erected thereon by the defendants, the action of ejectment is properly maintainable.

It results that the judgment must be and is affirmed.