387 So.2d 1194 (1980)
RAMSEY RIVER ROAD PROPERTY OWNERS ASSOCIATION, INC.
v.
Charles E. REEVES et al.
No. 13391.
Court of Appeal of Louisiana, First Circuit.
June 9, 1980.
Rehearing Denied September 4, 1980.
*1195 J. Arthur Smith, III, Frederick W. Ellis, Jr., Baton Rouge, Neville M. Landry, Covington, for plaintiff, appellee.
Perrin C. Butler, New Orleans, Larry J. Green, Covington, for defendants, appellants.
Before COVINGTON, LOTTINGER and COLE, JJ.
COLE, Judge.
This is a suit by a property owners association which seeks to enjoin the construction of a bridge over an allegedly navigable waterway.
The defendants are owners of real estate located in Sections 15, 16, and 44 of Township 6 South, Range 11 East of St. Tammany Parish, Louisiana, some of which is adjacent to the Bogue Falaya River. They propose to build a bridge across that river in the vicinity of their property to facilitate the development of a subdivision.
Plaintiff contends the river is navigable in law because it was, in fact, navigable at the time Louisiana was admitted to the Union in 1812 and is, therefore, a public waterway which cannot be privately bridged. The district court granted the relief sought by the plaintiff and permanently enjoined construction of the span. We conclude the judgment must be affirmed.
The legal considerations pertaining to a determination of the navigability of a body of water have been set out by the courts of this state on many occasions. Upon its admission to statehood, the state of Louisiana became the owner of the beds of the navigable waters within its boundaries. Gulf Oil Corporation v. State Mineral Board, 317 So.2d 576 (La.1975); Smith v. Dixie Oil Co., 156 La. 691, 101 So. 24 (1924). In D'Albora v. Garcia, 144 So.2d 911 (La. App. 4th Cir. 1962), these settled principles are stated:
"A test of the navigability of water bottoms is that those which are navigable in fact must be regarded as navigable in law, and they are navigable in fact when they are so used or are susceptible to such use, or are shown to be capable of commercial use. United States v. Utah, 283 U.S. 64, 51 S.Ct. 438, 75 L.Ed. 844; Packer v. Bird, 137 U.S. 661, 667, 11 S.Ct. 210, 211, 34 L.Ed. 819; The Daniel Ball, 10 Wall. 557, 563, 19 L.Ed. 999, 1001; Olin Gas Transmission Corp. v. Harrison, La. App. 1st Cir. 1961, 132 So.2d 721, 726 (writs refused).
"It was particularly noted in the Packer case that it is the susceptibility of use as highways of commerce which gives sanction to the public right of control to the exclusion of private ownership of either the waters or the soils under them. Thus, it has been emphasized that the capability of use by the public for purposes of transportation and commerce affords the true criterion of navigability rather than the extent and manner of use. Economy Light & Power Co. v. United States, 256 U.S. 113, 122, 123, 41 S.Ct. 409, 412, 65 L.Ed. 847; United States v. The Montello, Etc., 20 Wall. 430, 22 L.Ed. 391. Nor, as was pointed out in United States v. Appalachian Electric Power Co., 311 U.S. 377, 61 S.Ct. 291, 85 L.Ed. 243, does the lack of commercial traffic preclude a conclusion of navigability where personal or private use by boats demonstrates the navigability of the stream for a type of commercial navigation.
"Thus, the general rule is stated in 56 Am.Jur., p. 645, `Waters,' § 179:
`Navigability, in the sense of actual usability for navigation or navigability in fact, as a legal concept embracing both public and private interests, is not susceptible of definition or determination by a precise formula which fits every type of stream or body of water under all circumstances and at all times. A general definition or test *1196 which has frequently been approved is that rivers or other bodies of water are navigable when they are used, or are susceptible of being used, in their ordinary condition, as highways for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water. * * *'
This general rule has been followed and applied in numerous cases by the United States Supreme Court. In addition to the authorities hereinabove cited, reference is made to the following cases: United States v. Oregon, 295 U.S. 1, 55 S.Ct. 610, 79 L.Ed. 1267; United States v. Holt State Bank, 270 U.S. 49, 46 S.Ct. 197, 70 L.Ed. 465; Brewer-Elliott Oil & Gas Co. v. United States, 260 U.S. 77, 43 S.Ct. 60, 67 L.Ed. 140; Donnelly v. United States, 228 U.S. 243, 33 S.Ct. 449, 57 L.Ed. 820. The jurisprudence of the State of Louisiana likewise supports the general rule. State v. Jefferson Island Salt Mining Co., 183 La. 304, 163 So. 145; State v. Sweet Lake Land & Oil Co., 164 La. 240, 113 So. 833; State ex rel. Board of Com'rs of Atchafalaya Basin Levee Dist. v. Capdeville, 146 La. 94, 83 So. 421 [cert. den. 252 U.S. 581, 40 S.Ct. 346, 64 L.Ed. 727].
"It was particularly pointed out in the United States v. Appalachian Electric Power Co. case, supra, that the conditions of exploration and settlement of an area explained the infrequency or limited nature of such use of waters as highways of commerce, and that the lack of commercial traffic does not preclude the conclusion that a body of water is navigable where personal or private use demonstrates the capability of the stream for a type of commercial navigation; the question of the availability of the body for navigation is controlling rather than the extent of commerce conducted thereon. A similar observation was made by the Louisiana Supreme Court in State v. Jefferson Island Salt Mining Co., supra.

"Nor, has it been held that in order for a water body to be navigable it must be such as all times, inasmuch as its navigability is not destroyed because of interruptions by occasional obstructions (Goodwill v. Police Jury of Bossier Parish, 38 La.Ann. 752); * * *"
Our courts have also recognized that a determination of navigability does not necessarily involve an inquiry into whether the body of water is susceptible to modern means of travel, but rather, that methods of transportation used in the era involved in the particular case being considered must be examined. As quoted in Smith v. Dixie Oil Co., supra:
"`It must be remembered that navigation in 1812, and for a number of years thereafter in the South, meant transportation by scows, rafts, dugouts, and canoes.'"
Therefore, if the waterway in question was used for the purposes of trade and commerce in 1812, it is to be considered to have been a navigable body of water although it may no longer serve that purpose. From our review of this record, we are persuaded, as was the trial judge, that the Bogue Falaya River, at the site of the proposed bridge, was navigable at that period of time and after, and that it is now within the domain of the state of Louisiana.
The site of the proposed bridge is approximately four miles north of the city of Covington, Louisiana. At that location, the evidence indicates the river is about ninety to one hundred feet in width and is shallow, having a usual depth of one to two feet. However, during the spring high water period, its depth increases greatly and it is not uncommon for the river to overflow its banks during those times.
The historical information presented shows in the area with which we are concerned landowners in the early nineteenth century commercially operated sawmills and grist mills and the river was an important part of the local economy. Considerable evidence was presented which demonstrated timber and other forest products were regularly floated down the Bogue Falaya for marketing by way of rafts and in the time period before railways appeared, the river was the only economically feasible *1197 way available to transport logs. The remains of a milling operation in that area has been located and identified.
Of great importance also is the decision of the Supreme Court of this state in Ingram v. Police Jury of the Parish of St. Tammany, 20 La.Ann. 226 (1868). At issue there was the navigability of the Bogue Falaya at a point about one mile north of the city of Covington. There, the court said:
"If this bayou or river be navigable, the defendants have no right to build the contemplated bridge, unless it be erected on such a plan that it will not obstruct the free navigation of said river.
"Captain John Thompson, testified:
`He is captain of the steamer Aurora, running from the Sulphur Spring to New Orleans, carrying bricks: The Sulphur Spring is on the Bayou Falia river in the parish of St. Tammany. This Steamer runs above that point and place to the brick-yard of plaintiff. The Aurora carries 20,000 bricks; her tonnage is forty-five tons registered; where the brick-yard is, the channel is about twenty feet wide in low-water, and about thirty feet in high-water; the draft of this boat is four feet loaded; he has been running this boat a month and has made regular trips from the brick-yard to the Basin in New Orleans; from his knowledge of this river, it is navigable between the two points mentioned for vessels and small size steamers that usually navigate Lake Ponchartrain; the bricks are manufactured for a company in New Orleans and Mr. Ingram is the foreman. Witness had already made in October, 1867, three trips, and was on his fourth; had carried between 17,000 and 18,000 bricks in low-water; there is ebb and flow in the river up to the brick-yard; generally twice a day ebb and flow; the length of the Aurora is ninety feet, breadth fourteen feet three inches.'
"It appears from the testimony of other witnesses, that this Bayou Falia has often gone over the bridge, which was carried away; that at the place of the bridge, the waters of the Bogue Falia have risen from low-water-mark, to about twenty feet perpendicular in a freshet. This Bayou Falia empties into the Tchefuncta river, and the latter into Lake Ponchartrain.
"The residence of plaintiff is about a mile by land from the town of Covington in St. Tammany parish.
"Upon the whole, we are of opinion that this river Falia is navigable in the intendment of the law, and that no plea of prescription can avail in such a case as this, involving a thing hors de commerce and a public right. [Abert v. Bayon] 3 N.S. 650; [Municipality No. 2 v. Orleans Cotton Press] 18 L. 272 [36 Am.Dec. 624].
"It is therefore ordered and decreed that the verdict of the jury be set aside, and the judgment rendered thereupon be annulled and avoided. It is further ordered and decreed that the injunction be made perpetual, without prejudice to the defendants' rights to build and erect such a bridge that will not obstruct the free navigation of said river Falia; the defendants and appellees to pay costs in both courts."
Ingram substantiates the conclusion the river was used for logging purposes in 1812 and in the years that followed. The testimony of many witnesses who worked and lived on the river is set out at length in this record. They verify the long standing commercial uses and importance of the river to residents in those times. Additionally, legislative acts during the early nineteenth century were enacted to protect and improve the navigability of this river. The defendants presented no evidence to the contrary and called no witnesses. We conclude the plaintiff has proven its case by a clear preponderance of the evidence.
The appellants also contend the Ramsey River Road Property Owners Association, Inc. has no standing to bring this suit. They reurge here their objections of lack of procedural capacity, nonjoinder of necessary and indispensable parties and no cause *1198 and no right of action. This issue must also be resolved in favor of the plaintiff.
Suits by non-profit corporations are specifically sanctioned by law. See LSA-R.S. 12:207. Although this question has apparently been infrequently litigated in the courts of this state, the right of an association to prosecute a suit such as this has been approved in state and federal decisions. In Garden District Property Owners Association, Inc. v. City of New Orleans, 98 So.2d 922 (La.App. Orl.Cir. 1957), such a suit was sanctioned. There, the court observed:
"Counsel for the plaintiff corporation frankly states in his brief that so far as he knows `never * * * has any Louisiana appellate court been confronted with the question before this Court', and he states that question as follows: `Can a property owners' association whose membership individually would have the right, as neighboring property owners, to bring an action to restrain a zoning violation, institute such an action on their behalf?'
"While it is true that no Louisiana cases are found and while it must be conceded that we are not controlled by decisions in other jurisdictions on such questions, still, where the reasoning of those other decisions is persuasive, we find ourselves much affected by it and we therefore direct attention to several cases from other jurisdictions in which this identical question was presented. These cases are: Neponsit Property Owners' Association v. Emigrant Industrial Savings Bank, 278 N.Y. 248, 15 N.E.2d 793, 118 A.L.R. 973; In Matter of City of New York, Public Beach, Borough of Queens, 269 N.Y. 64, 199 N.E. 5; City of Omaha v. Glissmann, 151 Neb. 895, 39 N.W.2d 828; North Shore Beach Property Owners Ass'n., Inc. v. Town of Brookhaven, Sup., 115 N.Y.S.2d 670 and Merrionette Manor Homes Improvement Association v. Heda, 11 Ill.App.2d 186, 136 N.E.2d 556.
"In the Neponsit case, supra, the Court said [278 N.Y. 248, 15 N.E.2d 798]:
`The corporate plaintiff has been formed as a convenient instrument by which the property owners may advance their common interest. We do not ignore the corporate form when we recognize that the Neponsit Property Owners' Association, Inc., is acting as the agent or representative of Neponsit property owners. As we have said in another case: When Neponsit Property Owners' Association, Inc., "was formed, the property owners were expected to, and have looked to that organization as the medium through which enjoyment of their common right might be preserved equally for all," * * *.'
"It is argued that the same reasoning is applicable here and that the statement made by the Court of Appeals of New York in that decision is most persuasive. There the Court quoted with approval the following from its earlier decision in Matter of City of New York, Public Beach, Borough of Queens, supra:

`It may be difficult, or even impossible, to classify into recognized categories the nature of the interest of the membership corporation and its members in the land. The corporate entity cannot be disregarded, nor can the separate interests of the members of the corporation * * *.'
and the Court then added:
`Only blind adherence to an ancient formula devised to meet entirely different conditions could constrain the court to hold that a corporation formed as a medium for the enjoyment of common rights of property owners owns no property which would benefit by enforcement of common rights * * *.' [278 N.Y. 248, 15 N.E.2d 798]
* * * * * *
"We wonder, however, how it can be said that a corporation, which is organized for the very purpose of bringing such suits as this, has no real and actual interest in such a matter. The Nonprofit Corporations Statutes, LSA-R.S. 12:101 et seq., authorize the creation of such a corporation and section 109 provides that while the acts which such corporations may perform are somewhat limited, they *1199 may perform `those acts which are necessary or proper to accomplish the purpose or purposes as expressed or implied in the articles, or that may be incidental thereto.'
"If a corporation organized to accomplish just such a purpose and which is authorized to do any act necessary to accomplish that purpose, surely it is authorized to bring such suit as may be required.
"And section 120 of LSA-R.S. 12, which section has reference to such non-profit corporations, provides for the bringing of suits. And while it is provided that the president or the vice-president `may, on behalf of the corporation, authorize the institution of any legal proceedings * * * without other general or special powers from the board of directors,' we do not take this to mean that the board cannot authorize the secretary-treasurer to institute such a suit as this. It is alleged that the suit is brought in the name of the corporation and there is attached to the petition the affidavit of the secretary-treasurer to the effect that he was authorized to institute it by resolution of the Board of Directors. See Prince Hall Grand Lodge, etc. v. M. W. Prince Hall Grand Lodge, La.App., 79 So.2d 97.
"We think that the suit was properly brought and that the plaintiff corporation had the legal right to institute it."
The appellants rely upon the recent decision of Save Our Wetlands, Inc. v. Werner Brothers, Inc., 372 So.2d 231 (La.App. 4th Cir. 1979) in which the plaintiff's failure to establish its standing to sue resulted in the dismissal of the suit. While the majority opinion in that case does not elaborate upon the reasons for the court's judgment, we note the concurring opinion speculated as regards the composition of the plaintiff corporate entity, "SOWL." It was stated: "Presumably SOWL is pushed by some human beings-perhaps adults, perhaps residents of the place; but also perhaps not." The writer then concluded: "The law does not grant the right to a non-profit corporation to exercise the citizenship rights (if any) of its anonymous members, * * *." Unlike SOWL, the facts of this case establish the corporate plaintiff's real and justiciable interest in the preservation of the river's present condition and the direct effect the outcome of this lawsuit will have upon its members. This association is obviously composed of citizens who are landowners in the immediate area of the proposed construction and its purposes are stated to be:
"The purposes for which this corporation is organized are non-profit purposes, to-wit: to study and conduct public education concerning ecology, environmental and flood control problems, needs and facilities in the Ramsey River Road area of Covington, Louisiana; to promote political responsibility in environmental and ecological areas; to take action on local, state and national government matters relating to the above purposes; to cooperate with other persons or entities having similar purposes; to perform or have performed studies of the environmental impact, of the costs and benefits, and of the legalities of proposed facilities; to institute, defend, or participate in appropriate legal, administrative, or other proceedings to serve the above purposes or to seek protection of the environment and compliance with all laws and regulations related to matters affecting it; to raise and use funds (on a non-profit basis) for the above purposes, express or implied; and to do those acts incidental thereto, including the power to lease, acquire, receive, own, use, mortgage, sell and dispose of movable and immovable property; and to do any lawful activity for which corporations may be formed under Chapter 2, of Title 12 of the Louisiana Revised Statutes (the Non-profit Corporation Law)."
As in the Garden District case, supra, we think this association's interest to be sufficient to prosecute this action.
For the reasons stated above, the judgment of the district court is affirmed, all costs of this appeal to be paid by appellants.
AFFIRMED.